STATE, ex rel. *v.* DEAR, et al.

In Banc.   Dec. 3, 1951.

No. 38083  (55 So. (2d) 370)

Matthew Harper, Jr., Assistant Attorney General, for appellant.

Harold Cox and Will S. Wells, for appellees.

## McGehee, C. J.

This cause is here on a second appeal, the same having been reversed and remanded on May 8, 1950, as reported in State ex rel. Kyle v. Dear, 209 Miss. 268, 46 So. (2d) 100, 47 So. (2d) 150.

On the former trial the court sustained a motion to exclude the evidence offered by the state, and dismissed its bill of complaint which sought to have declared void a sale of sixteenth section timber on the ground that this trust property had been sold for such a grossly inadequate consideration as to virtually amount to a donation in violation of Section 95 of the State Constitution. The agreed statement of facts upon the trial then disclosed that the Board of Supervisors of Hinds County had on June 19, 1944, sold to Mrs. Gus Dear at and for the sum of $500 all of the merchantable timber of not less than 10 inches in diameter at the stump, and situated on that part (consisting of 300 to 350 acres) of Section Sixteen, Township 4 N., Range 1 East, lying west of Pearl River in said county, and that by mistake the land was described as being in Township 5 N., Range 1 East; that "on or about May 1944, the appellee Greif Brothers Cooperage Corporation first became interested in this timber and (later) found from the records that Gus Dear and wife held a deed thereto, and they opened negotiations for the purchase of said timber culminating in the payment of $4,000 to Gus Dear and wife for a deed thereto", and that the subsequent vendee cut and removed 875,394 feet of timber from said land.

It appears that in the meantime on June 9, 1945, the Dears obtained from the board of supervisors a corrected deed in favor of Mrs. Dear, showing the receipt of the same consideration of $500, and which deed was recorded on June 14, 1945; and that on June 23, 1945, the Dears

conveyed the timber to the said Cooperage Corporation for the $4,000, after their said grantee had employed an attorney to examine the record of the deed and the proceedings of the board of supervisors relating to the sale, which disclosed the price paid by the Dears for the same.

At the conclusion of the evidence offered by the State on the former trial, showing the foregoing facts and also that the timber was "the normal pine and hardwood species" and of "the average quality found in that vicinity of Pearl River", the motion to exclude the evidence was sustained without the defendant having introduced any evidence on their behalf in explanation of why the board of supervisors had sold the timber for $500 which the purchaser was able not long thereafter to sell to the Cooperage Corporation for $4,000.

On the former appeal, we reversed and remanded the cause in order that the defendants should be required to meet the prima facie case made by the proof on behalf of the State on the first trial by showing, if they could, that the sum of $500 was not such a grossly inadequate consideration as to come within the condemnation of this provision of the Constitution; and we then held that under the agreed statement of facts the Cooperage Corporation as the subsequent vendee of the Dears was not an innocent purchaser for value without notice, in view of the facts disclosed by the record as to the consideration paid by the Dears for the timber; and further, that "the absence of fraud or bad faith is controlling in the instant case only as to the liability of the members of the board of supervisors and their bondsmen", as to whom we affirmed the former decree in dismissing the bill.

Upon remand for the new trial the State introduced, in addition to the same agreed statement of facts, two witnesses, Taylor and Welsh, the former testifying that he was familiar with the timber on that part of the sixteenth section here involved and that the same was worth from $12 to $14 per thousand feet stumpage when sold;

and the latter testifying as a representative of the Forestry Commission, that from his experience he was able to go upon the land after the timber had been cut and determine with reasonable certainty the species of trees that had been cut and removed, and that he found the same to have been worth from $10 to $16 per thousand feet stumpage. On the agreed statement of facts and this testimony the State rested its case on the second trial.

To meet the case thus made by the State, the defendants offered a former member of the board of supervisors, who was the only person connected with the board who ever went on the land, and he testified as to the inaccessibility of the timber except over the land belonging to the Dears, as to the fact that the land would overflow during the winter, spring and summer months, and as to the sale of this timber being in his opinion the best one that the board of supervisors had ever made of sixteenth section timber in this county. In this testimony, the witness is supported to some extent by the fact that it is claimed to have been third growth timber and the board had sold the merchantable timber on this 300 to 350 acres of *woodland* in 1927 for $75 and in 1933 for $30, believe it or not.

This witness also testified about having sold 160 acres of land of his own in that locality in 1944 or 1945 for $800, but he did not state how much of the area was woodland. The defendants also introduced as a witness Mr. Gus Dear and he testified about having sold the timber on 950 acres of his land, adjoining or near this sixteenth section, for the sum of $5,000, but he did not state how much of the acreage was in fields and how much in woods. He of course said that he thought $500 was a fair price for the timber that he sold for $4,000. Other witnesses on behalf of the Cooperage Corporation testified as to the inaccessibility of this timber and the difficulty of logging the same, but all of which factors were necessarily taken into consideration by the Cooperage

Corporation when it decided that it could afford to pay $4,000 for the timber since the said defendant was admittedly experienced in the logging of timber in Pearl River swamps in the previous conduct of its cooperage business.

■■ The defendant further undertook to show that the Cooperage Corporation was unable *to make a profit* on this timber because of the logging conditions and certain OPA price regulations. Such testimony was objected to on the ground that whether the purchaser makes a profit in the conduct of his timber operations is not the test in determining whether this trust property held for the benefit of the educable children of the township was sold for such a grossly inadequate price as to violate the section of the Constitution in question. Moreover, such fact is immaterial, and we are of the opinion that the objection to that testimony was well-taken.

The defendant Cooperage Corporation also undertook to show that it was necessary "that we have this timber" in furtherance of the war effort. ■■ However, the State as trustee of this timber for the benefit of the educable children of the township, when acting through the board of supervisors in administering the trust, was without authority to sacrifice the trust estate of these educable children in the interest of the war effort. Then, too, the testimony on behalf of the said defendant is silent as to whether or not it was reimbursed by the government on a cost plus basis, as was the customary practice in regard to those holding war contracts.

It should be observed that the defendants offered no witness to testify that the Dears took any advantage of their vendee or that there was less timber on the land or that the same was of lower quality than had been reported to the Cooperage Corporation by its own representatives who had made two inspections thereof, one in 1944 and the other immediately prior to the purchase by it. ■■ Having stipulated and agreed upon the trial that 875,394 feet of timber had actually been cut and

removed from the land, the defendants nevertheless offered no witness to testify whether it was worth $5, $8, or $10 or from $12 to $14 or $16 per thousand feet stumpage. The two witnesses for the State were the only persons to testify as to the stumpage value of these hundreds of thousand feet of timber cut and removed. Even at $5 per thousand feet stumpage, the timber cut and removed would have been worth $4,376.87, and certainly no witness would have had the temerity to say under oath that it was worth less than $5 per thousand feet stumpage during the war, if it was worth cutting and removing at all.

On the second trial, the question of whether or not the Cooperage Corporation was an innocent purchaser for value without notice and as to whether all the defendants had acted in good faith, were again considered by the trial court to be issues for determination on the retrial, evidently overlooking the fact that the law of the case, as announced on the former appeal, had fully eliminated these two issues, and that the cause was remanded for the purpose alone of permitting the defendants to show that the timber was not actually worth an amount greatly in excess of the price paid to the board of supervisors. That proof was not forthcoming except by opinions of witnesses dealing in generalities, which ranged from proof of the fact that a beaver dam existed on the land to showing the high priorities held by the Cooperage Corporation under the war effort as affected by OPA regulations, etc., whereas the only issue was whether the timber was worth the amount per thousand feet, stumpage, testified to by the witnesses for the State, or if not, then how much it was worth per thousand, the number of feet having been agreed on.

It was also contended by the defendant Cooperage Corporation that there had been some increase in value of the timber between the month of June of the war years of 1944 and 1945, but the witness for the said defendant on that point said that he "wouldn't attempt to tell you

how much it had increased in value". If the State was prima facie entitled to recover the difference between the $500 for which the board sold the timber and the $4,000 paid for it by the subsequent vendee, then it was incumbent upon the defendants to offer some evidence as to how much should be deducted from the demand of the State in that behalf. The State had shown by its witnesses that the timber was worth at least $10 per thousand feet stumpage according to the lowest estimate testified to by either the witness Taylor or Welsh; and this value would amount to $8,753.94 whereas the State is only suing for the sum of $3,500, representing the difference between the $500 paid by the Dears and the $4,000 paid to them by the Cooperage Corporation.

It is not contended that any of the 875,394 feet of timber was unfit for use. The timber foreman of the defendant Cooperage Corporation testified that they used it all; that the same was manufactured into slack barrel staves for use in making containers for war ammunition, except as to 70,000 feet thereof used for other purposes. As to the contention that any other purchaser of the timber would not have had the right of ingress and egress over the land of the Dears for the purpose of logging the timber, the defendants made no effort to show the probable cost to such other purchaser in acquiring a right of way for that purpose. Mr. Dear was asked: "Now, Mr. Dear, would you have permitted any other person who might have owned or bought this timber to bring it out over your property?" and he answered "Well, I would have looked for a little consideration. Wouldn't you?" Q. "A little or big? A. Pretty good." And later, he was asked whether or not if Greif Brothers had bought the timber directly from the board of supervisors would he have let them log it through his land, and his answer was "I would have looked for a little consideration." We are not to assume that he could have arbitrarily demanded more for a right of way through his swamp land than the same was

reasonably worth, since Section 8419, Code of 1942, would have enabled any other purchaser to acquire the right of way, and especially where it was the duty of the board of supervisors, as agent for the State in its capacity as trustee, to utilize this timber for the benefit of the educable children of the township. This was held in regard to the duty of the State to utilize minerals on such lands in the case of Pace v. State ex rel. Rice, Attorney General, 191 Miss. 780, 4 So. (2d) 270, and wherein it was held that the exercise of the police power of the State is inherent in the existence of a government and is not the subject of a waiver, barter, forfeiture or sale. The State cannot abdicate its duty as trustee of property in which the whole people are interested, such as sixteenth section land held by the State as trustee for schools, any more than the State can surrender its police power in the administration of government and in the preservation of peace and order.

Moreover, the 99-year lease on this land would have expired in 1948, after which time the board of supervisors would have had the unlimited right to cut and remove this timber, or to authorize its vendee thereof to do so upon acquiring a right of way at a reasonable cost over the adjoining swamp land in going to and from the sixteenth section. In other words, the timber did not have to be sold at a time when OPA regulations would preclude the beneficiaries of this trust from receiving a fair price for the trust property.

On remand of this cause, the defendants amended their answer so as to plead that under several former decisions of this Court ▪▪ ▪ "mere inadequacy of consideration" does not justify the invalidation of a sale of sixteenth section timber, among which decisions is that of Dantzler Lumber Company v. State, 97 Miss. 355, 53 So. 1, 4, discussed and distinguished on the former appeal of the instant case.

Moreover, there is not involved here a "mere inadequacy" of consideration. If the timber was actually

worth $4,000 as a fair valuation and it had sold for $3,500, there would have been a mere inadequacy of consideration, but what we have here is a consideration so grossly inadequate as to virtually amount to a donation under Section 95 of the State Constitution if it be assumed that the timber was worth the $4,000 which the subsequent vendee was willing to pay for the same, after having twice inspected it with a view of making the purchase. Therefore, the cases relied upon by the defendants are not applicable on the issue involved in the present case.

On the former appeal, we cited as authority for our holding the cases of State ex rel. McCullen v. Adams, 185 Miss. 606, 188 So. 551 and Koonce v. Board of Supervisors of Grenada County, 202 Miss. 473, 32 So. (2d) 264, 465. But, it is again argued that those cases are not applicable for the reason that fraud was involved in each of them. However, we cited the Adams case on the point that a subsequent vendee is not an innocent purchaser for value of property which public officials are authorized to sell where such vendee is familiar with the value thereof and knows, or is charged with notice, that his vendor has paid to such officials a grossly inadequate price therefor such as to virtually amount to a donation. In the Adams case [185 Miss. 606, 188 So. 553], the Court said: "since John Jordan was sufficiently familiar with the value of the land as to be willing to pay a cash consideration of $1,600 therefor" he was put on notice of the grossly inadequate price of $160 paid for the land by Adams in purchasing the same from the State Land Commissioner. It was for this reason that on the former appeal of the instant case we said "the defendant Cooperage Corporation likewise gained notice of the grossly inadequate consideration paid for this trust property when it examined (through its attorney) the recordation of the deed to his vendors, and at a time when the said defendant had determined that the timber was worth at least $4,000."

On the former appeal, we quoted with approval from the Koonce case involving the sale of sixteenth section timber, and said: " '* * * the Board of Supervisors had no right to sell this trust property, which it was administering as an agency of the State on behalf of the educable school children of the township in the capacity of a trustee, at such a grossly inadequate price in violation of Section 95 of the State Constitution, which prevents ''lands belonging to, or under the control of the state (from being) donated directly or indirectly, to private corporations or individuals,'' etc. This is even true where such lands belong to the State in fee simple, and here the property in question was being held by the State as trustee, and was being controlled through the Board of Supervisors as a trust estate. . . .

" 'Private individuals who negligently fail to ascertain the value of their own property may, in the absence of fraud, bind themselves by conveyances thereof for a grossly inadequate price, but this is not true of public officials dealing with property held by the State, either in fee simple or as trustee, and especially as trustee, where the price is so grossly inadequate as to virtually amount to a donation, in violation of our State Constitution.' " [209 Miss. 268, 46 So. (2d) 104.]

And, on the former appeal, the Court said, in reference to the foregoing quotation, the following: "The foregoing announcement of the Court is contrary to the contention made in the brief of the defendant Cooperage Corporation, wherein the Dears have joined, to the effect that the fixing of a price on Sixteenth Section timber by the Board of Supervisors is conclusive and cannot be inquired into in the absence of fraud. It is beyond the power of the Board to make a sale of Sixteenth Section timber under the authority conferred upon the Boards by Section 6599, Code of 1942, for such a grossly inadequate price as to virtually amount to a donation thereof since Section 95 of our Constitution expressly prohibits this from being done. The Constitution is

paramount to any authority conferred by a statute when the action taken under the statute is in conflict with the Constitution.''

We are of the opinion that the decree of the trial court in again dismissing the bill of complaint filed by the State to recover the difference between the $500 paid by the Dears to the board of supervisors for the timber in question and the $4,000 paid to the Dears by the Cooperage Corporation is manifestly against the overwhelming weight of the competent evidence on the second trial and is contrary to the law of the case as announced on the former appeal without regard to whether our conclusion as to the law at that time was correct or incorrect, and that therefore the cause should be either reversed and remanded or a decree should be rendered here for the appellant on the ground that the defendants did not meet the case made by the State upon the trial.

Two of the Judges are of the opinion that a decree should be rendered here for the State and one thinks that the cause should at least be reversed and remanded for a new trial, whereas Justices Hall and Kyle have taken no part in the consideration of the case, due to the absence and illness of the former and the previous official connection of the latter therewith as Attorney General. The judgment will therefore be that the case is reversed and remanded for a new trial.

Reversed and remanded.

**Hall** and **Kyle, JJ.**, not participating.

**Lee, J.** (dissenting).

In the first trial of this case, the State showed merely that Greif Brothers Cooperage Corporation purchased for $4,000 sixteenth section timber for which Dear had paid the county only $500. It was conceded that there was no fraud in the sale by the board of supervisors to Dear. Under those circumstances, the lower court sus-

tained the motions of the defendants to dismiss, thereby holding that mere inadequacy of consideration did not invalidate the sale.

On the appeal of the case here, State ex rel. Attorney General v. Dear, 209 Miss. 268, 46 So. (2d) 100, 47 So. (2d) 150, the action of the lower court was affirmed insofar as the board of supervisors was concerned. But it was further held that the proof by the State was sufficient to make out a prima facie case of such gross inadequacy of consideration as to amount to a donation, and, for that reason, Dear and Greif Cooperage Corporation were under the duty to disclose the facts, and show that such inadequacy did not amount to a donation.

I was not in agreement with the opinion of the majority, and dissented therefrom. Suffice it all to say, it was my view that, in the absence of fraud, mere inadequacy of consideration is insufficient to invalidate such a sale. The large number of cases, cited in the dissent, in my opinion, sustain that view.

When the case went back for retrial, the court heard the evidence on the issue of inadequacy, and, in the decree, adjudicated as follows: ''the court finds as a fact, however, that the timber sold to Mrs. Dear and cut by Greif Brothers Cooperage Corporation was sold by the board for its reasonable market value at the time and under the circumstances shown in this record; that the defendant, Greif Brothers Cooperage Corporation, paid Gus Dear, et ux., in excess of the reasonable normal value of such timber under emergent circumstances in furtherance of the war effort and lost money in so doing and such sale thus provides no standard by which to test the value of said timber and there is no substantial evidence in this record to show the value of such timber sold by the board to exceed the amount it received therefor.''

It is a familiar rule that this Court will not disturb the finding of a chancellor on conflicting evidence, nor will it reverse a decree where the same is sustained by

substantial evidence, nor will it reverse such finding unless it is manifestly wrong.

Under this rule, it is necessary to review the evidence which was adduced before the trial court, and consider the same, together with the logical inferences arising therefrom to determine whether or not the decree is manifestly against the overwhelming weight of the evidence.

The State's proof simply showed that Greif Brothers Cooperage Corporation paid Dear $4,000 for timber which he had obtained from the board of supervisors for $500, and that, according to the respective opinions of the witnesses Taylor and Welch, the timber was worth $12 to $14, and $10 to $16, per thousand.

While Taylor did testify that he walked over the land about 1944 or 1945, with the intention of buying this timber, yet, on cross-examination, the record shows his vacillation on the question of value as follows: "Q. Did you ever look at that timber on this particular sixteenth section with the idea of determining what the value of it was? A. No, sir." The witness Welsh admitted, on cross-examination, that he arrived at his estimate of value by looking at the stumps, after the timber had been cut and removed, and about thirty days before the trial. But the witness Bond, for the appellees, testified that one cannot "tell from looking at the stump as to the merchantability or quality of that timber."

If Taylor was not trying to determine the value of the timber at the time he was looking over it, evidently the chancellor, with good reason, considered his testimony of little value. And, in view of the conflict between the evidence of Welsh and Bond, the chancellor was well warranted in rejecting Welsh's testimony altogether.

In answer to the State's case, the appellees showed that previous sales of the timber on this land were made on October 10, 1926, and December 7, 1933, for $75 and $30, respectively. By its stipulation, the State agreed to these facts: In September 1943, the board of supervisors

gave consideration to selling this timber, and made known its purpose in local timber circles. The sole access was over Dear's adjacent land. The timber was largely cut over hardwood in a low and swampy area, bounded on the east and south by Pearl River, and on the west and north by lands of others. The area was subject to overflow during the fall, winter and spring months. Logging was more difficult and expensive on that account. In the December 10, 17, and 24 issues of the Jackson Daily News, the board invited competitive bids. Pursuant thereto, at the January 1944 meeting, bids of $250, $350, and Dear's bid of $500 were submitted. The board was without authority, under an opinion of the attorney general to pay for an appraisal of this timber. The board accepted Dear's bid as the highest and best obtainable, and believed that it obtained a fair and reasonable value. The Cooperage Corporation first became interested in this timber in May, 1944, and had no connection with Dear's purchase. It bought the timber only after competent counsel had examined the records, and advised that a deed from Dear, et ux., would convey a good title. It paid the full price, filed its deed, and began and completed the cutting and removal. The filing of this suit was the first notice to it that its title was being questioned.

Appellees adduced oral evidence from several witnesses.

Perry Luckett, a supervisor, testified that he was familiar with this timber. It was being stolen, and he wanted to do something about it. He secured one timber man to look it over, but his bid was only $250. The land was full of gullies and sloughs. The only way to remove the timber was over Dear's land. This witness thought that the board made a good sale, in fact the best sale ever made by it. He himself owned 160 acres adjacent to this sixteenth section, and his timber was a better quality. He sold this acreage, land, timber and minerals, for $800.

W. L. Bond testified that all of the section overflowed. In some places, the water stood 20 to 30 feet deep, whereas at others, it was 4 to 5 feet. Sawmills cannot use crooked logs.

Gus Dear testified that he would have required a "pretty good consideration" to use his land in removing this timber; that the swampy conditions influenced his bid; that if the timber had been accessible, it would have been worth 2, 3, or 4 times as much; and that timber prices were going up.

E. L. Stanford testified that, under no circumstances, would the Cooperage Corporation have bought the timber unless Dear had consented to its removal over his land— that it would not have offered even $500. He testified that the maximum ceiling price on this timber, under OPA price regulations of date May 15, 1944, was as follows: "A. Well, on blackgum $23; Tupelo gum $23; sweetgum $23; elm $22; hackberry $20; hickory $21; birch $20. Do you want me to read the whole list? A. Just tell us what the approximate main average would be. A. Well, it would run approximately $22. Q. What is the delivered price? A. That is the delivered price to the mill or to some point within 25 miles of the mill." The logging and delivery to the mill, according to his testimony, cost from $30 to $40 per thousand. "Q. It cost you from $30 to $40 a thousand to log it? A. To cut, haul, and deliver it to the mill." They used trucks and tractors and operated at a loss. "Q. At that time, when you paid $4,000 for this timber, you figured it was worth $4,000 to you, didn't you? A. It was not a question of worth. It was a question of getting out war production. Q. You weren't operating on a loss, were you? A. Absolutely. Q. You were? A. Absolutely." Timber was getting scarce too. "Q. Was timber a great deal scarcer and harder to get in June 1945 than it was in 1944? * * * A. It was for me." This witness further testified that, while he did not attempt to say how much

the timber had increased in value from June 1944 to June 1945, ''I would say it had increased in value materially.''

F. C. Holland, who logged on this job, said he had to ''snake some of them (the logs) as far back as a quarter of a mile.'' As to the difficulty in loading, he said: ''Well, we loaded the bed and second bed and then bound those down and then finished loading and bound them down. They were so crooked you had to bind them down to keep them on the truck.'' The crooked condition of the logs necessitated more trips. As to the difficulty in these logging operations, this witness said: ''When it was wet, we had to bring them (the trucks) out with the tractors * * * and after a rain you had to tie the tractors down behind the truck and let it down in the slews to keep it from turning over.'' Such operations were necessary for about one-third of the time. The logs were cut into 10 and 20-foot lengths in the woods, and then into 32-inch lengths at the mill, and this enabled the Cooperage Corporation to make use of all timber. This witness further testified that this timber, for practical purposes, would not have been salable to the average mill. ''Q. In other words, for the average purpose that timber is sold for, it just would not have been salable timber at all, would it? A. No, I wouldn't think so. Q. I see. Except for somebody who was especially equipped to use this particular type timber for this particular type work, it was not a very salable proposition, was it? A. I wouldn't think so.''

The evidence was positive and uncontradicted that the Cooperage Corporation, in this instance, operated at a loss; and there is neither proof, nor insinuation, in this record, that it was operating on a cost plus basis in its contract with the government, or that it was reimbursed for its loss.

The proof was ample to show that this timber, on account of its location and quality, possessed little, if any, value for ordinary sawmill purposes. This was borne out in the fact that, even after advertisement and

solicitation for bids, only three persons manifested any interest and their bids were only $250, $350 and $500. Under normal conditions, it is unlikely that Dear could have realized any considerable profit from this timber inasmuch as his vendee would have been compelled to absorb the heavy expenses of getting the timber out of the woods, with little likelihood of profit. But emergent conditions subsequently developed. The country was at war. The Cooperage Corporation had a contract with the government to supply staves for ammunition barrels. It needed timber to fill its contract. It had the equipment to log anywhere. It felt that it was compelled to acquire this timber, regardless of price. It did so.

It turned out, however, that this timber which cost the Cooperage Corporation at least $30 a thousand to cut and haul to the mill, could not then and there, after delivery to the mill, be sold for more than $22 per thousand. Thus, over against the State's mere opinion evidence, inherently weak and somewhat discredited, as to the value of this timber, stood the positive and uncontradicted evidence of the appellees that the cost of getting the timber out of the woods was greater than could be realized for it after delivery to the mill. I therefore pose this question: If timber, which cost $30 per thousand to cut and haul to the mill, cannot then and there, after delivery to the mill, be sold for more than $22 a thousand, how can a court adjudge that such timber, standing in the woods possessed any normal market value whatsoever?

The Cooperage Corporation paid Dear about $5 a thousand for this timber. According to the proof, it lost both the consideration and $8 additional on each thousand, a total of $13 a thousand. What man, in his right mind, would wittingly make such a bargain, unless he was under compulsion, or necessity for some other reason? I concede that the test of value is not to be determined solely by whether or not a profit is made. Mismanagement may, and does, sometimes turn potential profits

into serious losses. But there is neither proof nor insinuation, in this record, that the Cooperage Corporation was guilty of mismanagement in this operation. Its mistake in paying too much for the timber ought not to serve as the barometer by which its losses may be further increased.

Solicitation and anxiety for the welfare of the educable children, sometimes expressed with great feeling and emotion, should not goad a court into the infliction of wrong upon one, who, either from compulsion or naive business acumen, has paid too much for property in which such educable children have a beneficiary educational interest.

The question of the erroneous admission as to good faith of the parties and in reference to the rule of property, on account of previous decisions of this Court, in my opinion, are wholly immaterial. At any rate, the State conceded the truthfulness of the former proposition in the agreed statement of facts. And if the Court arrived at the right result, those considerations should be ignored.

The learned chancellor had the witnesses before him and observed their demeanor. He was in much better position to resolve the issues of fact than are we who are permitted to view only the cold printed page. In my opinion, the decree is sustained by substantial evidence. I certainly am unable to say that it is against the overwhelming weight of the evidence, or that it is manifestly wrong.

With the greatest deference for my associates, I would affirm the decree.