STATE OF LOUISIANA, BY SCHOOL BOARD OF PARISH OF TANGI-
PAHOA v. WILLIAM T. JOYCE CO. et al.

(Circuit Court of Appeals, Fifth Circuit.    October 6, 1919.    Rehearing Denied,
December 6, 1919.)

No. 3361.

PUBLIC LANDS ☞54(1)—DISPOSAL OF LOUISIANA SCHOOL LANDS.

Under Act April 21, 1806, and Act March 3, 1811, reserving section 16
in each township of land in the territory of Louisiana, when surveyed for
the future state, when created in compliance with the treaty of cession, to
be used for support of schools, title to such sections vested in the state on
its admission, to the exclusion of the United States, as also the right to
dispose of the same in such manner as it deemed best to carry out the
purpose of the dedication, and a sale and conveyance of any of such lands
by the state is not invalid, because not made as prescribed by Act Feb.
15, 1843.

In Error to the District Court of the United States for the Eastern
District of Louisiana; Rufus E. Foster, Judge.

Action by the State of Louisiana, by the School Board of the Par-
ish of Tangipahoa, against the William T. Joyce Company and others.
Judgment for defendants, and plaintiff brings error.    Affirmed.

William Winans Wall, of New Orleans, La., and Boliver E. Kemp,
of Amite, La., for plaintiff in error.

Robert R. Reid, of Amite, La., and Henry Fitts, of Chicago, Ill.,
for defendants in error.

Before WALKER and BATTS, Circuit Judges, and GRUBB, Dis-
trict Judge.

WALKER, Circuit Judge.    This was an action by the state of Lou-
isiana, acting through the parish school board of Tangipahoa parish,
for the recovery of two sections of land in that parish, namely, section
16, township 8 south, of range 8 east, and section 16, township 8 south,
of range 9 east.    There was a judgment in favor of the defendants on a
verdict rendered in pursuance of an instruction given by the court to
the jury, and the plaintiff by writ of error presents that judgment for
review.    The parties will be referred to as they were designated in the
trial court.

The defendants deraign title through sales made pursuant to the
provisions of an act of the Legislature of Louisiana—Act No. 168 of
1894—entitled:

"An act to provide for the sale of sixteenth section lands, where the town-
ship in which such lands is situated is not habitable by reason of the land
therein being swamp or sea marsh."

It was admitted that the townships of which the lands sued for are
parts are swamp and subject to tidal and storm overflow.    The theory
advanced in the argument of the counsel for the plaintiff to support
the claim asserted seems to be that the title to the land sued for still
is in the United States, not having been divested by the sales relied
on by the defendants, because such sales were made without the con-

sent of the inhabitants of the townships of which the lands are parts, as required by an act of Congress of February 15, 1843 (5 Stat. 600, c. 33), which authorized sales by the state only when prescribed conditions were complied with, and that, by virtue of an agency created by that act, the state is entitled to sue for and recover such sixteenth section lands as have not been disposed of by the state in the manner prescribed by that act. The following is the act of Congress just referred to:

"An act to authorize the Legislatures of the states of Illinois, Arkansas, Louisiana, and Tennessee to sell lands heretofore appropriated for the use of schools in these states.

"Section 1. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the Legislatures of Illinois, Arkansas, Louisiana, and Tennessee be, and they are hereby, authorized to provide by law for the sale and conveyance in fee simple, of all or any part of the lands heretofore reserved and appropriated by Congress for the use of schools within said states, and to invest the money arising from the sales thereof in some productive fund, the proceeds of which shall be forever applied, under the direction of said Legislatures, to the use and support of schools within the several townships and districts of country, for which they were originally reserved and set apart, and for no other purpose whatever: Provided, said land, or any part thereof, shall in no wise be sold without the consent of the inhabitants of such township or district, to be obtained in such manner as the Legislatures of said states shall by law direct; and in the apportionment of the proceeds of said fund, each township and district shall be entitled to such part thereof, and no more, as shall have accrued from the sum or sums of money arising from the sale of the school lands belonging to such township or district.

"Sec. 2. And be it further enacted, that the Legislatures of said states be, and they are hereby, authorized to make such laws and needful regulations as may be deemed expedient to secure and protect from injury or waste, the sections reserved by the laws of Congress, for the use of schools, to each township, and to provide by law, if not deemed expedient to sell, for leasing the same for any term not exceeding four years, in such manner as to render them productive, and most conducive to the object for which they were designed.

"Sec. 3. And be it further enacted, that if the proceeds accruing to any township or district from said fund, shall be insufficient for the support of the schools therein, it shall be lawful for said Legislatures to invest the same in the most secure and productive manner, until the whole proceeds of the fund belonging to such township or district shall be adequate to the permanent maintenance and support of schools within the same: Provided, that the Legislatures aforesaid shall, in no case, invest the proceeds of the sale of the lands in any township in manner aforesaid, without the consent of the inhabitants of said township or district, to be obtained as aforesaid.

"Sec. 4. And be it further enacted, that any sales of such lands, reserved as aforesaid, as have been made in pursuance of any of the laws enacted by the Legislatures of said states, and not inconsistent with the principles of this act, are hereby ratified and confirmed, so far as the assent of the United States to the same may be necessary to the confirmation thereof."

That the theory advanced in argument by the plaintiff's counsel is not the one which influenced the bringing of the suit is shown by the averments and prayer of the plaintiff's petition. The petition contained the following averments:

"That said sixteenth sections were reserved by the United States government to the state of Louisiana under acts of Congress of April 21, 1806, and 3d of March, 1811, for the support of public schools within the townships in which said sixteenth sections are situated. * * * That the state of Louisi-

261 F.—9

ana has never parted with the title to said sixteenth sections and they are still held by the state of Louisiana in trust for public school purposes for the benefit of the inhabitants of the respective townships in which said sixteenth sections are situated in accordance with the act of Congress granting sixteenth sections to the state for school purposes. * * * That notwithstanding petitioner's said ownership of said lands," etc.

The petition prayed for:

"Judgment in favor of your petitioner and against said defendants, decreeing and recognizing the state of Louisiana, your petitioner, as the owner of said" above-described lands "for school purposes, in accordance with the acts of Congress granting the land to the state of Louisiana," etc.

The averments and prayer of the petition indicate that the suit was intended to assert a right in the state to recover sixteenth section lands sold by it without complying with conditions prescribed by the above-quoted act of Congress, though the title to such lands had been granted by the United States to the state of Louisiana before that act was passed. In the argument in this court it was not contended that the plaintiff is entitled to recover if the title to the lands sued for was in the state of Louisiana prior to the passage of the above-quoted act of Congress; but, as above stated, it was contended that title to the lands sued for still is in the United States.

The lands in question are part of the territory which was ceded to the United States by France by the treaty of April 30, 1803 (8 Stat. 200). The following is article 3 of that treaty:

"The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States; and in the meantime they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess."

The following legislation was enacted before the state of Louisiana came into existence:

As to lands which had been surveyed in the Western district of Orleans, an act of Congress of April 21, 1806, provided that:

"All such land shall, with the exception of the section 'number sixteen,' which shall be reserved in each township for the support of schools within the same, * * * be offered to the highest bidder," etc. 2 Stat. 391, c. 39, § 11.

An act of Congress of March 3, 1811 (2 Stat. 662, c. 46), entitled "An act providing for final adjustment of claims to lands and for sale of public lands in the territories of Orleans and Louisiana, and repeal of act passed for the same purpose, and approved February 16, 1811,". contained the following provision:

"That the President of the United States be and he is hereby authorized, whenever he shall think proper, to direct that so much of the public land lying within the territory of Louisiana, as shall have been surveyed in conformity with the eighth section of this act, be offered for sale. All such lands shall, with the exception of section 'number sixteen,' which shall be reserved in each township, for the support of the schools within the same, * * * shall be offered for sale to the highest bidder," etc. Section 10.

Before the passage of the two last-mentioned acts of Congress, it already had been definitely and irrevocably settled that the territory

they dealt with was to be in a state which was to be admitted into the Union, "as soon as possible." It is obvious that the sixteenth sections were not withheld from sale with a view to a future sale or other disposition of them by the United States, and that it was not contemplated that the United States would use or administer those lands for the purposes of education. The quoted provisions amounted to an assurance to purchasers of other lands in the several townships that the future state in which the purchased lands would be "as soon as possible" would have the sixteenth sections for the support of schools within such townships. The beneficiaries of the appropriation or dedication of the sixteenth sections for the support of schools were, not the United States, but the future state in which the townships would be, and the inhabitants of such townships.

Language used in the act of February 15, 1843, shows that it was recognized that prior to that enactment the sixteenth sections had been "appropriated by Congress for the use of schools within said states." The above-quoted provisions of the acts of Congress of 1806 and 1811 effected as unequivocal a dedication of sixteenth sections for the support of schools in the townships, the remainder of which was authorized to be sold, as was effected by legislation which preceded the admission into the Union of states formed out of the territory northwest of the Ohio river which was ceded to the United States and out of the territory subsequently ceded by the state of Georgia. It is settled that the title to sixteenth sections in such states, when identified by appropriate surveys and not covered by prior grants or dispositions, vests in such states upon their admission into the Union, as a consequence of the action of Congress in setting them aside for the maintenance of schools, and that patents or formal grants thereof are not required to divest the title of the United States. Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338; Beecher v. Weatherby, 95 U. S. 524, 24 L. Ed. 440; Gaines v. Nicholson, 9 How. 356, 13 L. Ed. 172; Jones v. Madison County, 72 Miss. 777, 18 South. 87. A relinquishment of all rights of the United States in land may be effected by an act of Congress which shows an intention to segregate that land from the mass of the public domain and to set it apart for the use of a designated beneficiary, either presently and unconditionally, without anything else being required to be done to accomplish a change of ownership, or upon compliance with a prescribed condition other than the issue of a patent. Republican River Bridge Co. v. Kansas Pacific R. Co., 92 U. S. 315, 23 L. Ed. 515; Shaw v. Kellogg, 170 U. S. 312, 18 Sup. Ct. 632, 42 L. Ed. 1050.

The circumstances of the unconditional setting apart of the sixteenth sections in question were such that it is to be inferred that Congress intended that the state in which they would be, which was to be admitted into the Union "as soon as possible," was to be the donee; that state having been destined, from the time the territory included in it was acquired by the United States, to have exclusive and plenary power over the schools for the support of which those sections were set apart (Alabama v. Schmidt, 232 U. S. 173, 34 Sup. Ct. 301, 58 L. Ed. 555), and that the gift was to be consummated upon that state

being admitted into the Union and the donated lands being identified by surveys. Those lands were unequivocally and unconditionally appropriated to a purpose for the carrying out of which the future state alone was looked to. An ordinance of the convention of the representatives of the people of the territory of Orleans assembled pursuant to the act of Congress approved in December, 1811 (Act Feb. 20, 1811, c. 21, 2 Stat. 642), providing for the people of that territory forming a—

"Constitution and state government, and for the admission of such state into the Union, on an equal footing with the original states," etc.: Provided, in compliance with a provision of that act, "that the people inhabiting the said territory do agree and declare that they do forever disclaim all rights or title to waste or unappropriated lands, lying within the said territory, and the same shall be and remain at the sole and entire disposition of the United States."

The requirement and acceptance by Congress of a disclaimer so expressed indicate an absence of an understanding that the United States then owned or had the disposition of lands previously unconditionally appropriated for a public purpose of the state then coming into existence. The disclaimer did not affect the state's right or title to lands so previously appropriated.

Decisions of the Supreme Court of Louisiana have given to the action of Congress with reference to sixteenth sections which became parts of that state the effect of a grant thereof to the state. Garland v. Jackson, 7 La. Ann. 68; State ex rel. McEnevy v. Nicholls, 42 La. Ann. 209, 7 South. 738; State v. F. B. Williams Cypress Co., 131 La. 67, 58 South. 1033. We think rulings to that effect were proper, on the ground that the action of Congress and what was done under it amounted to a compact with the inhabitants and purchasers of the lands in the future state which was consummated by the state's admission into the Union and the identification of the donated sections by appropriate surveys. The action of Congress with reference to sixteenth sections in the territory which afterwards became the state of Louisiana is to be considered in the light of the fact that long before that action was taken the United States had adopted and adhered to the policy of providing for new states formed out of the public domain having for the support of education the sixteenth section of each township, or another section of the public land in lieu thereof, if that section was otherwise disposed of. Cooper v. Roberts, supra; Beecher v. Weatherby, supra; United States v. Morrison, 240 U. S. 192, 202, 36 Sup. Ct. 326, 60 L. Ed. 599. When so considered, the above-stated conclusion is a result.

Furthermore, the above-quoted provisions of the acts of Congress of 1806 and 1811 fairly may be regarded as the initial steps of a compliance with the obligation created by the provision of the treaty with the French republic securing to the inhabitants of the ceded territory the right to be—

"incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States."

Under an already settled policy one of the advantages accruing to public land states coming into the Union was that they had the sixteenth section in each township, or other equivalent public land, if that section was otherwise disposed of, for the support of schools in that township.

The terms of the act of February 15, 1843, indicate that in enacting it Congress assumed that previously there had been consummated appropriations of the sixteenth sections for the use of schools within the states mentioned, and that, notwithstanding such prior disposition of these sections, it remained in the power of Congress to determine the method to be pursued by those states in disposing of their school lands. The former assumption is inconsistent with the latter one. The consummated gifts of the school lands to the states being absolute, though such states were in honor bound to apply them to the purpose for which they were given, the validity of sales of them by the states is not dependent upon a compliance with a qualified permission to sell given by Congress after the lands had ceased to belong to the United States. Cooper v. Roberts, supra; Alabama v. Schmidt, 232 U. S. 169, 34 Sup. Ct. 301, 58 L. Ed. 555; Long & Long v. Brown, 4 Ala. 622. The sales by the state of the land sued for being questioned only on the ground that such sales were not made in the manner prescribed by the act of February 15, 1843, the attack on the validity of those sales cannot be sustained. The state had the power to sell those lands without the consent of Congress. Nothing in the mode adopted in exercising that power indicates that there was a disregard of the honorary obligation to use the lands for the support of schools. It is not intended to be intimated that the state could recover the lands it sold, if it had been guilty of a breach of faith in selling them for a purpose foreign to the one for which they were given to it.

The court did not err in directing a verdict in favor of the defendants. The judgment is affirmed

BATTS, Circuit Judge, did not take part in the decision of this case.