**MADISON COUNTY BOARD OF EDUCATION, and Dick Molpus, Secretary of State, State of Mississippi, Plaintiffs–Appellants,**

v.

**ILLINOIS CENTRAL RAILROAD COMPANY, Defendant–Appellee.**

No. 90–1026.

United States Court of Appeals,
Fifth Circuit.

Aug. 22, 1991.

Rehearing Denied Sept. 25, 1991.

293

Danny L. Crotwell, Jerry R. Wallace, Montgomery, Smith–Vaniz & McGraw, Canton, Miss., for Madison.

Mike Moore, Atty. Gen., Larry E. Clark, Special Asst. Atty. Gen., Leslie Scott, Asst. Atty. Gen., Jackson, Miss., for Molpus.

Joseph P. Wise, Robert P. Wise, Wise, Carter, Child & Caraway, Jackson, Miss., for Illinois Cent. R. Co.

1. *See* Miss.Code Ann. §§ 29–3–1 and 29–3–3 (Supp.1989).

Before WISDOM, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case arises from a title dispute concerning a railroad right-of-way over Sixteenth Section school lands in Madison County, Mississippi. For more than one hundred years, appellee, Illinois Central Railroad Company, and its predecessor railroad, the Yazoo & Mississippi Valley Railroad Company ("Y & MVRR"), have occupied and maintained a right-of-way and railroad track crossing the Sixteenth Section of Township 8 North, Range 1 West of Madison County, which was granted by the Mississippi legislature in 1882. In 1988, the Madison County Board of Education ("MCBE"), as trustee of the Sixteenth Section school land trust within the Madison County School District,[1] brought suit against Illinois Central claiming that the railroad had no right in or title to the property, and seeking its ejection and damages for wrongful use. This case therefore requires an examination of the nature of the state's ownership of certain Sixteenth Section lands. The district court determined that Illinois Central owned the title to the right-of-way pursuant to an 1882 Charter ("Charter")[2] in which the Mississippi legislature granted the land to the Y & MVRR. MCBE contends that the legislature lacked authority because Mississippi did not possess legal and equitable title to the lands in 1882. The district court, finding that the Charter contravened no existing statute, constitutional provision or trust obligations, granted Illinois Central's motion for summary judgment and dismissed the complaint. 728 F.Supp. 423. We affirm. We hold that the land was held by the State of Mississippi in an honorary trust arrangement that was not violated by the Charter.

2. *See* 1882 Miss.Laws Chap. 541.

## I

Although the facts in this case are uncontested, the issues are complex and involve consideration of numerous, very old land Cession Treaties and Acts of Congress. The dispute centers around the validity of the Charter pursuant to which the Mississippi State Legislature granted to Illinois Central's predecessor, the Y & MVRR, a right-of-way through Sixteenth Section lands in Madison County.[3] Section 7 of the Charter granted the Y & MVRR the right to build a railroad with a right-of-way of up to 200 feet in width "over any land belonging to this state," with the "title in fee simple" in the railroad, "its successors and assigns." Title would not vest, however, until the railroad "located" the track on state land as required by § 7. Further, § 13 provided, "[t]hat unless said company shall construct and have in operation twenty miles of railroad within three years from the passage of this act, the Legislature shall have the right to declare this Charter forfeited." 1882 Miss.Laws Chap. 541.

The grant to the railroad was made without cash compensation. The preamble of the Charter stated, however, that it was made, "in order to induce the investment of capital in the construction, maintenance and operation of such a railroad and branches, and thus develop the resources and wealth of this State." *Id.* The preamble also noted that, "[t]he physical difficulties of constructing and maintaining railroads [through the region] are of such that no private company has so far been able to establish a railroad and branches developing said basins and alluvial lands, and connecting them with the railroad system of the country." *Id.*

The Y & MVRR, relying upon the Charter, surveyed the right-of-way, constructed the roadbed, and opened the rail line across the Sixteenth Section of Madison County on May 1, 1884, as a part of the route from Jackson, Mississippi to Yazoo City, Mississippi.[4] *See Poor's Manual of Railroads* (1885). In 1885, the Y & MVRR constructed a depot on the Sixteenth Section adjacent to the right-of-way. The town of Flora in Madison County grew around the depot. Illinois Central continues to serve Flora today by connection of the main line to the Flora Industrial Park.

In 1946, the Y & MVRR conveyed all its property and assets to Illinois Central by deed. Illinois Central has occupied and maintained the right-of-way in reliance upon the title in fee simple vested by the terms of the Charter.

## II

This suit was originally filed in the Circuit Court of Madison County, Mississippi,

---

3. The pertinent provisions of the Charter, 1882 Miss.Laws Chap. 541, provide:

    WHEREAS, the construction of railroads in, through and along the Mississippi River Basin, and the Yazoo and Sunflower Basins, penetrating these and other alluvial lands in this state, west of the Chicago, St. Louis and New Orleans Railroad, and connecting them by railroads and branches with other railroads west, east, north and south, is deemed and hereby declared to be a work of great public importance and in strict accordance with the true policy and interest of this state, should be encouraged by legislative sanction and liberality . . .

    \*   \*   \*   \*   \*   \*

    NOW, THEREFOR, in order to induce the investment of capital in the construction, maintenance and operation of such a railroad and branches, and thus develop the resources and wealth of this state:

    \*   \*   \*   \*   \*   \*

    BE IT . . . ENACTED that the right-of-way is hereby granted said company to pass in and through the State of Mississippi with said railroads, branches, spurs and laterals aforesaid, and to enter on and use all lands, rocks, timber, earth, sand, gravel, water and other materials, which may belong to the State of Mississippi, and convenient and necessary for the use of said railroad; and wherever said railroads or the branches, spurs or laterals aforesaid are located over any lands belonging to this State, title in fee simple to 100 feet on each side of the center of said railroad track or tracks shall vest in said company, its successors and assigns . . .
    1882 Miss.Laws Chap. 541.

4. The original right-of-way that is the subject of this appeal runs generally in a north/south direction with a width of 150 feet for a distance of 3,549 feet beginning at the southern end and thereafter with a width of 100 feet for a distance of 1821 feet, terminating at the northern end within the city limits of Flora, Mississippi.

by the MCBE against Illinois Central and Dick Molpus, Secretary of State, State of Mississippi. The Complaint alleged that Illinois Central had no right in or title to the property in question. It asked that Illinois Central be ejected from the property and required to pay damages for its wrongful use. Illinois Central removed the matter to federal court. It then filed an answer asserting that it was the owner in fee of the right-of-way. Molpus was later realigned as a party/plaintiff.

Illinois Central moved for summary judgment. It argued that it was the owner of the right-of-way in fee simple through its predecessor, the Y & MVRR. Illinois Central also asserted alternative grounds including adverse possession, estoppel, the later grant to the railroads of easements across the lands by legislative enactment, and the preclusion of MCBE's suit by the Contract and Due Process Clauses of the Mississippi and United States Constitutions. The district court held that Illinois Central owns the right-of-way in fee simple. The district court concluded that the Mississippi legislature, in passing the Charter, "contravened no existing statute or constitutional provision nor violated its trust obligations to the school children of the State of Mississippi." Accordingly, the district court entered summary judgment for Illinois Central and dismissed the Complaint with prejudice. MCBE and Molpus separately appeal.[5]

5. "MCBE" will refer to both the Madison County Board of Education and the Secretary of State, Dick Molpus.

6. On May 19, 1852, Congress enacted legislation authorizing the Legislature of the State of Mississippi to sell the Sixteenth Section lands in the state and ratifying and approving sales already made. The 1852 Act provided:

BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED STATES OF AMERICA IN CONGRESS assembled, that the Legislature of the State of Mississippi shall be, and is hereby authorized to sell and convey in fee-simple, or lease, for a term of years, as the said Legislature may deem best, all or any part of the lands heretofore reserved and appropriated by Congress for the use of schools within said State, and to invest the money arising from said sales, as said Legislature may direct, for

## III

We review the summary judgment of the district court *de novo*. *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1015–16 (5th Cir.1990). The exercise of *de novo* review requires us to conduct an independent review of the record, but in accordance with the same standards that the district court must apply in granting summary judgment. *Degan v. Ford Motor Co.*, 869 F.2d 889, 892 (5th Cir.1989). Under Fed.R.Civ.P. 56(c), summary judgment is proper if, when viewing the evidence most favorably to the non-moving party, "the pleadings [and other documentary evidence on file] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bache v. American Tel. & Tel.*, 840 F.2d 283, 287 (5th Cir.1988).

## IV

Although MCBE raises several arguments that rest upon the premise that the State of Mississippi did not have the title or the right to convey the subject Sixteenth Section lands to the Y & MVRR, the most cogent of these arguments is that the 1882 Charter violated the supremacy clause of the Constitution because it conflicted with an 1852 Act of Congress (1852 Act).[6] By addressing the supremacy

the use and support of schools within the several townships and district or county for which they were originally reserved and set apart, and for no other use, or purpose whatsoever: *PROVIDED, said lands or any part thereof, shall, in no case be sold or leased without the consent of the inhabitants of such township or district to be obtained in such manner as the Legislature of said state may by law direct; AND PROVIDED FURTHER, that in all cases, the money arising from the sales of land within a particular township and district, shall be appropriated to the use of schools within that township and district.* Section 2. AND BE IT FURTHER ENACTED, that sales heretofore made by authority of the Legislature of the State of Mississippi of lands reserved and appropriated as aforesaid, are hereby ratified and approved in the same manner and to the same extent, as if this act had been in force at the time of said sales. 10 Stat. 35 (1852) (emphasis added).

clause argument, we effectively dispose of all of MCBE's federally-based arguments. Therefore, our resolution of the issue of title will be in the context of the supremacy clause arguments that MCBE makes.

MCBE argues that in 1852, the title to these lands rested in the United States; that the 1852 Act effectively conveyed to the State of Mississippi title to these lands to dispose of them in an appropriate way for the benefit of education, providing however, that the consent of the inhabitants of the township was required before disposition. Because the Charter did not require the consent of the inhabitants before conveying the lands to the Y & MVRR, it is in conflict with the 1852 Act. Consequently, the conveyance pursuant to the Charter was nullified by the supremacy clause.

The resolution of this question depends upon whether Mississippi had title to these lands in 1852, and if so, the character of that title. If Mississippi owned these lands in fee simple absolute, the 1852 Act was inapplicable to these lands; on the other hand, if Mississippi owned these lands subject to a federally created trust, MCBE argues that the 1852 Act is applicable.

Therefore, we first must determine which federal land grant relates to these lands; second, we must determine whether the grant conveyed legal title; and third, we must determine whether the grant conveyed equitable title, that is, whether the grant burdened the title with a binding, federally created trust. After we address the federally related issues, we will then turn to address MCBE's arguments that state law precluded the legal transfer to these lands.

A

The Supreme Court recently considered the nature of the title of Mississippi Sixteenth Section lands in *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Although the Court disposed of the case on Eleventh Amendment grounds without determining whether a particular trust was imposed on the title to these land, the Court did observe that:

The starting point of any consideration of this question must be the federal grants themselves, for it is clear that the interest transferred to the State depends on the federal laws that transferred that interest. If the federal law provided for the transfer of an absolute fee interest, the lands are owned outright by the State. On the other hand, if the federal law created a trust with the State as trustee, the State is bound to comply with the terms of that trust.[7]

Accordingly, in determining who held title to the Sixteenth Section school lands in Madison County in 1882, our starting point is the federal grant that transferred the land to the State of Mississippi.

(1)

The general history of the Sixteenth Section lands in Mississippi is discussed by the Supreme Court in *Papasan. See, e.g.,* 106 S.Ct. at 2935–38. For clarity of this opinion, we repeat the relevant parts of that history. In 1798, Congress created the Mississippi Territory, which included the southern third of the present states of Mississippi and Alabama.[8] Before 1802, the

---

**7.** *Papasan,* 106 S.Ct. at 2946 n. 18 (citations omitted). The Court recognized that each of these possible conclusions finds some support in its prior cases, noting that some school land grants do create express trusts while others do not. *Compare Cooper v. Roberts,* 59 U.S. 173, 181–82, 18 How. 173, 181–82, 15 L.Ed. 338 (1856) and *Alabama v. Schmidt,* 232 U.S. 168, 34 S.Ct. 301, 58 L.Ed. 555 (1914), *with Ervien v. United States,* 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919), *Lassen v. Arizona ex rel. Arizona Highway Dept.,* 385 U.S. 458, 460–61, 87 S.Ct. 584, 585–86, 17 L.Ed.2d 515 (1967) and *Alamo Land & Cattle Co. v. Arizona,* 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976). The Court sug-

gested, without deciding, that one possible explanation for the distinction between these cases is the variation in the terms of the different land grants. 106 S.Ct. at 2946 n. 18.

**8.** *See* 1 Stat. 549. Like the 1802 Georgia Cession, the act creating the Mississippi Territory included no Sixteenth Section school lands reservation, and provided only that the territory be governed by the terms of the Northwest Ordinance of 1787. 1 Stat. 549, 550 at § 6 (1798). The Northwest Ordinance of 1787 stated as to education only that, "[r]eligion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the

State of Georgia, as a former English colony, held title to the territory now forming the northern half of the states of Mississippi and Alabama. In 1802, Congress enacted the Articles of Cession and Agreement ("Georgia Cession") under which Georgia ceded to the United States "all the right, title, and claim, which the state has to the jurisdiction and soil of the land situated within the boundaries of the United States, south of the state of Tennessee." *See* 1857 Miss.Code at 645. The lands covered by the Georgia Cession included the northern half of the present states of Mississippi and Alabama. Most important to our case, however, the Georgia Cession purported to convey to the United States only such lands as to which Indian title had been extinguished. In 1802, the lands comprising present-day Madison County were part of the Choctaw Nation, and therefore not ceded to the United States by the Georgia Cession.[9]

### (2)

In 1802, much of the land that comprises present-day Mississippi was owned by several Indian Nations. Over the decades, the United States entered into a series of different land cession treaties with the Indian tribes. The United States thus acquired title to different Sixteenth Section lands in Mississippi at different times, under the various Indian cession treaties.[10]

As we have observed, before 1820 the lands situated in present-day Madison County were part of the Choctaw Nation. They were therefore not covered by either the Georgia Cession, the early Acts of Congress concerning the Mississippi Territory,[11] the Mississippi Enabling Act,[12] or the 1817 Sales Act.[13] In 1820, however, title to

---

means of education shall forever be encouraged." 1 Stat. 50, 52 (1787).

**9.** *See* 1857 *Miss.Code* at 645. *See generally,* R. Cross, *Atlas of Mississippi,* University Press of Mississippi (1974); D. Rowland, *Encyclopedia of Mississippi History,* vol. 2 Selwyn A. Bryant (1907).

**10.** *See, e.g.,* Treaty of Fort Adams, 7 Stat. 66 (1801); Treaty of Hoe Buckintoopa, 7 Stat. 80 (1803); Treaty of Mount Dexter, 7 Stat. 98 (1805); Treaty of Doak's Stand, 7 Stat. 210 (1820); Treaty of Dancing Rabbit Creek, 7 Stat. 340 (1830); Treaty of Pontotoc Creek, 7 Stat. 381 (1832).

**11.** During the period between 1802 and 1820, numerous acts and statutes were passed affecting Sixteenth Section lands in parts of Mississippi. In 1803, Congress provided for the survey of lands comprising the Mississippi Territory to which Indian title had been extinguished. This survey statute provided for the survey, auction, and sale of territorial lands for settlement purposes, "with the exception of the section number sixteen, which shall be reserved in each township for the support of schools within the same." 2 Stat. 233, 233–34 (1803). In 1804, the Mississippi Territory was extended northward to the southern boundary of Tennessee. 2 Stat. 305 (1804). In 1806, Congress authorized the selection of lands in lieu of unavailable Sixteenth Sections in the Territory. 2 Stat. 401 (1806).

**12.** The Mississippi Enabling Act of March 1, 1817, authorized the inhabitants of the western part of the Mississippi Territory to be admitted into the Union. The Enabling Act, however, made no mention of the reservation of Six-

teenth Section lands. It simply provided that the State of Mississippi, "when formed, shall be republican, and not repugnant to the principles of the Ordinance (of July 13, 1787)," and extend to the territory covered by the 1802 Act between the United States and Georgia. 3 Stat. 348, 349 at § 4 (1817).

**13.** Shortly after passage of the Mississippi Enabling Act, the Congress, on March 3, 1817, enacted a further Land Sales Act ("1817 Sales Act") that "authoriz[ed] the appointment of a surveyor for the lands in the northern part of the Mississippi Territory, and the sale of certain lands therein described" that had not been surveyed under the earlier 1803 statute. 3 Stat. 375 (1817). The Act provided that the appointed surveyor cause "the lands above mentioned, which have not already been surveyed, into which the Indian title has been extinguished, to be surveyed and divided in the manner provided by law for the surveying of other public lands of the United States in the Mississippi Territory." *Id.* Further, the lands, "after having been surveyed according to law, shall, with the exception of Section No. 16, in each township which shall be reserved for the support of the schools therein ... be offered for sale to the highest bidder." *Id.* at § 3. The Sixteenth Section lands and lands selected in lieu thereof were granted to the State of Mississippi. *Papasan,* 106 S.Ct. at 2937 (citing *Lambert v. State,* 211 Miss. 129, 137, 51 So.2d 201, 203 (1951)).

The parties have extensively briefed how the Georgia Cession, the Mississippi Enabling Act, and the 1817 Sales Act affect the title to Sixteenth Section lands in Madison County. However, because the lands in Madison County were

the land that includes Madison County was acquired by the United States from the Choctaw Indians through the Treaty of Doak's Stand.[14] Upon the signing of the Treaty of Doak's Stand, title to the land comprising present-day Madison County was held by the United States as public lands in anticipation of its becoming part of the State of Mississippi. 7 Stat. 210. *See generally State of Louisiana v. Joyce*, 261 F. 128 (5th Cir.1919).

Following the Treaty of Doak's Stand, Congress, in 1822, enacted legislation ("1822 Act") prescribing the sale of the public lands ceded to the United States by the Choctaws.[15] To facilitate the disposal of these public lands, the territory was to be formed into a land district, a land office was to be established, and the lands were to be surveyed into sections and townships. Upon completion of the survey, the President of the United States was granted authority, "when he shall think proper, to cause so much of the land within the district" to be exposed to sale. The 1822 Act, however, placed two limitations upon sale of these lands. First, the lands were to be sold "on the same terms and conditions,

and in the same manner as all other public lands of the United States." Second, the 1822 Act reserved the Sixteenth Section lands in each township from the President's power of sale, inserting these words: "with the exception of Section No. 16 in each township which shall be reserved for the use of schools within the same."

Because the 1822 Act transferred the land in Madison County from the United States to the State of Mississippi, this Act is the land grant that governs the Sixteenth Section lands at issue. Accordingly, the resolution of the federal issues in this case ultimately turns on the construction given to the Sixteenth Section reservation in the 1822 Act; that is, whether this reservation conveyed legal title, equitable title, or both. *Papasan, supra.*

### B

The first prong of MCBE's supremacy clause argument is that legal title to the Sixteenth Section lands in question remained vested in the United States after the completion of the survey under the

held by the Choctaws prior to 1820, these acts and statutes are irrelevant for determining this title, as the parties now recognize in their supplemental briefs.

**14.** 7 Stat. 210 (1820). Under this treaty, the Choctaw Nation ceded approximately 5.5 million acres to the United States, including present-day Madison County. *See* McLemore, *A History of Mississippi*, Univ. and College Press of Miss., 1973 Vol. I at 134.

**15.** 3 Stat. 680 (1822). The 1822 Act was entitled, "An Act providing for the disposal of the public lands in the state of Mississippi, and for the better organization of the land districts in the states of Alabama and Mississippi." The act, which expressly reserved the sale of Sixteenth Section lands, provided:

BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED STATES OF AMERICA, IN CONGRESS ASSEMBLED, that all that tract of country which was ceded to the United States by a treaty with the Choctaw Indians held on the 18th day of October, in the year of our Lord, 1820, near Doak's Stand, in the State of Mississippi, be, and the same is hereby, formed into a land district; ...

SECTION 2. BE IT FURTHER ENACTED, that the President of the United States be, and he is hereby, authorized, when he shall think

proper, to call so much of the land within the District created by this Act, or which may be attached to the District of Pearl River, and *which may be surveyed, to be exposed to sale, on the same terms and conditions, and in the same manner as all other public lands of the United States, with the exception of Section No. 16 in each township which shall be reserved for the use of schools within the same* ...

SECTION 3. BE IT FURTHER ENACTED, that all of the lands lying on the east side of the Tombigbee River, in the State of Mississippi, and to which the Indian title has been extinguished, be, after the 13th day of October next, attached to the District established by the first section of this Act; and the public lands therein shall be sold, on the same terms and conditions, and in the same manner, and patent shall issue for the lands so sold, agreeably to the provision of the laws for the disposal of *the public lands of the United States* and the State of Mississippi, *with the exception of the section numbered sixteen, in each township, which shall be reserved for the use of schools within the same,* and of such other reservations as now are made, or hereafter may be made by law ...

3 Stat. 680 (emphasis added).

1822 Act.[16] To establish this point, MCBE points to Congress' characterization of the territory acquired at Doak's Stand as lands "ceded to the United States," and as "the public lands of the United States." When providing for the later disposal of these public lands under the 1822 Act, Congress expressly reserved the Sixteenth Sections from all federal sales. MCBE argues that reading the phrase "the public lands of the United States" (*see* n. 13, *supra*), together with the language expressly reserving the Sixteenth Sections from sale, demonstrates Congress' intent that title to the Sixteenth Section lands was to remain vested in the federal government. Accordingly, because title to these lands was retained by the United States, they were governed by the 1852 Act. Finally, the argument goes, because the right-of-way here was granted "without the consent of the inhabitants" of Madison County, the Charter directly contravened an act of Congress and is therefore void under the Supremacy Clause.[17]

### (1)

Although we agree that the United States held title to these lands in 1822, we do not believe that it retained title under the 1822 Act. In *State of Louisiana v. Joyce,* 261 F. 128 (5th Cir.1919), we addressed whether the United States retained title to Louisiana Sixteenth Section school lands.[18] The Sixteenth Section lands there were governed by an 1811 Act of Congress ("1811 Act") that contained a reservation comparable to the one in the 1822 Act. *See* 2 Stat. 662. The 1811 Act provided:

> [T]he President of the United States be and he is hereby authorized, whenever he shall think proper, to direct that so much of the public land lying within the territory of Louisiana, as shall have been surveyed in conformity with the eighth section of this act, be offered for sale. All such lands shall, with the exception of section 'number sixteen,' which shall be reserved in each township, for the support of the schools within the same, * * * shall be offered for sale to the highest bidder.[19]

The Tangipahoa Parish School Board sued to recover Sixteenth Section lands sold by the State without complying with the "consent of the inhabitants" conditions set out by an 1843 Act of Congress.[20] The school

---

**16.** The survey and designation of the lands directed by the 1822 Act was not completed until October 1825.

**17.** *See* U.S. Const. art. 6, cl. 2. Our review of the record reveals that no evidence was presented to the district court concerning whether the inhabitants of Madison County consented to the transfer of land to the Y & MVRR in 1882. Nevertheless, because we hold that no consent was required for the Mississippi Legislature to grant the right-of-way, the issue of consent is irrelevant in the resolution of this case.

**18.** The lands in question in *Joyce* were part of the territory ceded to the United States by France by the Treaty of April 30, 1803. *See* 8 Stat. 200.

**19.** 2 Stat. 662, c. 46. This act repealed an earlier 1806 Act of Congress which had been passed before the State of Louisiana came into existence. The 1806 Act applied to lands in the Western District of Orleans that had been surveyed. It similarly provided that, "All such land shall, with the exception of section 'number sixteen,' which shall be reserved in each township for the support of schools within the same, * * * be offered to the highest bidder." 2 Stat. 391, c. 39, § 11.

**20.** The 1843 Act is comparable to the 1852 Act at issue in this case. The 1843 Act provided

> Section 1. ... the Legislatures of Illinois, Arkansas, Louisiana, and Tennessee be, and they are hereby, authorized to provide by law for the sale and conveyance in fee simple, of all or any part of the lands heretofore reserved and appropriated by Congress for the use of schools within said states, and to invest the money arising from the sales thereof in some productive fund, the proceeds of which shall be forever applied, under the direction of said Legislatures, to the use and support of schools within the several townships and districts of country, for which they were originally reserved and set apart, and for no other purpose whatever: *Provided, said land, or any part thereof, shall in no wise be sold without the consent of the inhabitants of such township or district, to be obtained in such manner as the Legislatures of said states shall by law direct*; and in the apportionment of the proceeds of said fund, each township and district shall be entitled to such part thereof, and no more, as shall have accrued from the sum or sums of money arising from the sale of the school lands belonging to such township or district.

5 Stat. 600 (emphasis added).

board argued that title to the Sixteenth Section lands had remained with the United States after the land was surveyed. Like MCBE, the Tangipahoa School Board argued for the rescission of the Sixteenth Section land sales because the sales were made without the consent of the inhabitants of the townships, as required by the 1843 Act. 261 F. at 128–30.

The *Joyce* court rejected the argument that the United States had retained any interest in the lands. We reasoned that although the 1811 Act withheld the Sixteenth Section lands from public sale, it did not do so in contemplation that the lands were subject to further disposition by the United States. *Id.* at 131. More precisely, we did not believe that Congress intended that *the United States* would use or administer the Sixteenth Section lands for the purposes of education. *Id.* We explained:

> [T]he validity of sales of [school lands] by the states is not dependent upon a compliance with a qualified permission to sell given by Congress after the lands had ceased to belong to the United States. The sales by the state of the land sued for being questioned only on the ground that such sales were not made in the manner prescribed in the [1843 Act], the attack on the validity of those sales cannot be sustained. The state has the power to sell those lands without the consent of Congress.

*Id.*

The *Joyce* court relied on several Supreme Court cases in reaching its conclusion that title to Sixteenth Section lands was not retained by the United States. In *Cooper v. Roberts*, 59 U.S. (18 How.) 173, 181–82, 15 L.Ed. 338 (1856), the Court addressed the nature of the title of the State of Michigan, which was admitted to the Union with the "unalterable" condition that "every section No. 16, in every township of the public lands ... shall be granted to the State for the use of schools," to certain mineral rights in section sixteen school lands. The Court determined that before the survey of townships and the determina-

tion of specific sections, the right of the State of Michigan to Sixteenth Section lands rested in "compact." *Id.* The Court described the nature of this "compact" as being "binding on the public faith." *Id.* Once the survey of the land into sections was complete, the Court explained, the compact had "an object upon which it can attach, and if there is no legal impediment, the title of the State becomes a legal title." *Id.* Thus, the Court concluded that the consent of Congress to sell Sixteenth Section school lands "is not, perhaps, necessary." *Id.*

Similarly, in *Gaines v. Nicholson*, 50 U.S. (9 How.) 356, 13 L.Ed. 172 (1850), the Supreme Court applied these same principles to Mississippi Sixteenth Section lands. In that case, the Supreme Court considered a claim presented by heirs of a Choctaw Indian, D.W. Wall, who, pursuant to the terms of the 1830 Treaty of Dancing Rabbit Creek, had received a reservation in his personal name to select a section of land in this ceded territory.[21] Wall selected a Sixteenth Section. Although the Court remanded the dispute to the circuit court, it stated that

> The State of Mississippi acquired a right to every sixteenth section ... on the extinguishment of the Indian right of occupancy, the title to which, in respect to the particular sections, became vested ... as soon as the surveys were made and the sections designated. No patent was necessary, or is ever issued, for these school sections.

*Id.* at 363.

MCBE would distinguish these cases on the grounds that the land grants in question are distinct from the 1822 Act. MCBE points out that in *Cooper*, the Sixteenth Section lands were granted directly to the State of Michigan. Although *Gaines* addressed Mississippi Sixteenth Section lands, MCBE argues because that dispute involved a different Indian treaty and federal land grant, *Gaines* is not binding in this

---

**21.** *See* 7 Stat. 340 (1830). The issue in *Gaines* was whether the general right to select a section of land in the ceded territory, which was ex-

pressly reserved to the plaintiff's predecessor in title under the treaty, operated to suspend the vesting of the title in the State.

case. Additionally, MCBE points out that the statutory language used to transfer Sixteenth Section lands acquired from the Chickasaw Nation in 1832 provided that the lands "shall vest in the State of Mississippi for the use of the schools." *See* Treaty of Pontotoc Creek, 5 Stat. 116. The failure of the 1822 Act expressly to vest title in the State of Mississippi, argues MCBE, mandates the conclusion that Congress intended title to remain with the United States. In other words, had Congress intended to vest title in the State of Mississippi to the lands acquired at Doak's Stand, it would have used language comparable to that used for the Chickasaw lands or the State of Michigan.

The Supreme Court in *Alabama v. Schmidt*, 232 U.S. 168, 34 S.Ct. 301, 58 L.Ed. 555 (1914), however, appears to have rejected the argument that differences in the precise terms of the federal land grants are significant in determining whether the United States retained legal title to Sixteenth Section lands. The *Schmidt* Court concluded that, "in which ever way [the Sixteenth Section reservation is] expressed, probably it means the same thing, *so far as the legal title is concerned.*" [22] *Id.* (emphasis added).

### (2)

The principles announced in the above cases apply with equal force to the instant case. The federal land grant at issue in the case at bar is virtually identical in its relevant language to the land grant addressed in *Joyce*. Like the Louisiana Sixteenth Section reservation, the 1822 Act provides, in pertinent part, that

The President of the United States ... is hereby, authorized, to cause so much of the land ... to be exposed to sale ... with the exception of section numbers sixteen, in each township, which shall be reserved for the use of schools within the same.

3 Stat. 680. Accordingly, we think that *Joyce* is controlling precedent requiring us to hold that the United States did not retain legal title to the Sixteenth Section lands in Madison County through the express reservation in the 1822 Act. We thus conclude: before the completion of the survey required by the 1822 Act, title to the lands now comprising Madison County were held in a compact between the United States and the State of Mississippi by virtue of the Treaty of Doak's Stand; upon completion of the survey in 1825, however, legal title to the Sixteenth Section lands in Madison County became vested in the State of Mississippi.

### C

Our conclusions thus far, however, do not resolve this case. The sales of Sixteenth Section lands in *Joyce* were challenged "only on the ground that such sales were not made in the manner prescribed in the [1843 Act]." 216 F. at 131. In rejecting the Tangipahoa School Board's supremacy clause argument, the *Joyce* court *impliedly* held that the State of Louisiana took title to the Sixteenth Section lands in fee simple absolute. *Id.* The *Joyce* court does not appear to have addressed expressly whether Louisiana acquired less than a fee simple interest.

In the second prong to its supremacy clause argument, MCBE argues that the State of Mississippi acquired less than a fee simple interest in the Sixteenth Section lands in Madison County. Specifically, MCBE argues that the reservation of Sixteenth Section lands in the 1822 Act created a binding trust arrangement, with the lands as the corpus of the trust, and the schools and inhabitants of the township as the beneficiaries. Such a federally-created trust, it is argued, would prohibit any deviation from the educational purpose expressed in the 1822 Act. Additionally, MCBE continues, under a binding federal

22. It may appear that this view conflicts with the Supreme Court's later statements in *Papasan* that the terms of the federal land grants are critical in determining the nature of the conveyance of Sixteenth Section lands to the states. In *Papasan*, however, the Court was addressing whether a restrictive trust was created by the land grant; *Schmidt*, in contrast, speaks to whether the United States retained *legal* title to the lands. Whether the United States retained equitable title or otherwise imposed a trust on Sixteenth Section lands is a distinct issue.

trust arrangement, the 1852 Act would be applicable to prohibit the State from selling or disposing of the Sixteenth Section lands without the consent of the inhabitants.

(1)

We begin our consideration of whether the 1822 Act created a binding trust by analyzing the congressional policy behind Sixteenth Section lands. A historical analysis of the federal Sixteenth Section school lands policy provides insight into the congressional policy that prevailed at the time. The history of public school lands in the United States stretches over 200 years. Even before the ratification of the Constitution, the Congress of the Confederation initiated a practice in the Northwest Territory that was followed with most other public lands that eventually became States and were admitted to the Union. In particular, the Land Ordinance of 1785, which provided for the survey and sale of the Northwest Territory, "reserved the lot No. 16, of every township, for the maintenance of public schools within the said township." 1 Laws of the United States 565 (1815). In 1802, when the eastern portion of the Northwest Territory became what is now the State of Ohio, Congress granted Ohio the lands that had been previously reserved under the 1785 Ordinance for the use of public schools in the State. 2 Stat. 175. Following the example of the Ohio grant, "grants were made for common school purposes to each of the public-land States admitted to the Union." *Andrus v. Utah*, 446 U.S. 500, 506–07, n. 7, 100 S.Ct. 1803, 1807 n. 7, 64 L.Ed.2d 458 (1980) (quoting *United States v. Morrison*, 240 U.S. 192, 198, 36 S.Ct. 326, 328, 60 L.Ed. 599 (1916)). "The history of the school lands grants in Mississippi generally follows the pattern thus described." *Papasan*, 106 S.Ct. at 2936.

The Supreme Court in *Papasan* suggested the purpose behind the Sixteenth Section school lands program:

The precise reasons for this practice are somewhat unclear, but it seems likely that they were a combination of an overall practice of encouraging education, a congressional desire to accelerate the dis-position of western lands at a higher price, and a policy of trying to put the public lands States on some sort of a par with the original States in terms of taxable property since federal land, a large portion of the new States, was not taxable by them.

*Id.* at 2935 n. 4 (citations omitted). *Cf. Gaines v. Nicholson, supra* (generally describing Sixteenth Section lands as having been appropriated for the benefit of schools by the acts of Congress); *State of Louisiana v. Joyce*, 261 F. at 133 ("Under an already settled policy one of the advantages accruing to public land states coming into the Union was that they had the Sixteenth section in each township, or other equivalent public land, if that section was otherwise disposed of, for the support of schools in that township").

The crucial question, of course, is whether these concerns over Sixteenth Section lands produced a congressional policy of imposing binding trust obligations upon the States. In *Cooper v. Roberts*, the Court characterized the importance of the congressional policy as follows:

[T]he constancy with which the United States have adhered to the policy [of setting aside Sixteenth Section lands for schools] in the various compacts with the people of the newly formed States, and the care which Congress has manifested to prevent the accumulation of prior obligations which might interrupt it, fully display their estimate of its value and importance. There is obviously, a definite purpose declared to consecrate the same central section of every township of every state which might be added to the federal system, to the promotion 'of good government and the happiness of mankind,' by the spread of 'religion, morality and knowledge,' and thus, by a uniformity of local association, to plant in the heart of every community the same sentiments of grateful reverence for the wisdom, forecast and magnanimous statesmanship of those who framed the institutions for these new States, before the constitution for the old had yet been modeled.

59 U.S. (18 How.) at 179. Although the *Cooper* Court described the Sixteenth Section lands as being held in "trusts created by ... compacts," it nevertheless explained the nature of the trust as

> relat[ing] to a subject certainly of universal interest, but of municipal concern, over which the power of the State is plenary and exclusive. In the present instance, the grant is to the State directly, *without limitation of its power, though there is a sacred obligation imposed on its public faith.*

*Id.* at 181, 182–92, 15 L.Ed. at 341 (*citing Long v. Brown,* 4 Ala. 622, 631 (1843) (holding that the state's sale of Sixteenth Section land "pursuant to the act of the Legislature, is valid and binding on the inhabitants of the township")).

In similar fashion, Justice Holmes in *Alabama v. Schmidt,* characterized the trust arrangement as follows:

> The gift [of 16 section lands] to the state is absolute, although, no doubt, as said in *Cooper v. Roberts,* "there is a sacred obligation imposed on its public faith." But that obligation is honorary, ... and even in honor would not be broken by a sale and substitution of a fund, as in that case; a course, we believe, that has not been uncommon among the states.

*Id.* 232 U.S. at 172–74, 34 S.Ct. at 302; *see also State of Louisiana v. Joyce, supra,* ("characterizing the Sixteenth Section reservation as an honorary obligation to use the lands for the support of schools"). Perhaps most significantly, Justice Holmes concluded that "the state has authority to subject [Sixteenth Section] land in its hands to the ordinary incidents of other titles in the state." *Id.*

(2)

(a)

The 1822 Act expressly states that all public lands acquired by the Treaty of Doak's Stand were to be sold "with the exception of Section No. 16 in each township which shall be reserved for the use of schools within the same." MCBE interprets this language as a binding mandate that all Sixteenth Section lands be used for the benefit of local schools by reading "*shall* be reserved for the use of schools" as saying that Sixteenth Section land *shall be used for schools.* Thus, by emphasizing the word "shall" in this context, MCBE urges that the 1822 Act creates a binding trust obligation for the use of Sixteenth Section lands for schools.

We, however, interpret the Sixteenth Section lands reservation differently from MCBE by reading the mandatory language as saying that the President "shall reserve Sixteenth Section lands from the sale of these public lands," not that the states *shall* use the lands for education. The disputed language must be read in the context of the Act itself, as well as the sentence in which it appears. The primary purpose of the 1822 Act was to authorize the President to sell the public lands acquired from the Choctaws at Doak's Stand. The Act is in effect speaking to the President of the United States and instructing him in the disposition of these lands. Specifically, the President, after the lands are surveyed and when he shall think proper, is authorized to sell *all* the lands in the district, on the same terms and conditions as all other public lands of the United States, *except* the Sixteenth Sections which, Congress states, he *shall* reserve from sale. Thus, we read "shall" in the 1822 Act as only mandating that the Sixteenth Section lands be reserved from the President's power of sale.

Finally, we read the language "for the use of the schools" as clearly expressing Congress' intent that the states will use these reserved lands for educational purposes, but this language is nevertheless precatory, not mandatory. The subject of the reservation clause is education, a matter that in the 1820s was undeniably a "municipal concern, over which the power of the state was plenary and exclusive." *Cooper* at 182. Additionally, we think it unlikely that in 1822 that the Congress intended to place binding restrictions on how a state might dispose of its own lands.

This interpretation is the only one that fully makes sense. First, MCBE's interpretation is inconsistent with the principle

that the United States held public lands in "compact" for the land grant states, and that upon completion of the survey of the lands, the compact attached and title immediately vested. *See Cooper, supra.* MCBE's construction of the statute as Congress "hereby reserving the land for the use of schools," rather than Congress "reserving the lands from sale by the President," would seem to leave the title reserved in the United States, a proposition that has been rejected repeatedly. *See, e.g., Joyce; Schmidt, supra.* Furthermore, although Congress made plain its intent that the land was to be used for schools, it provided no means of enforcing this term as a condition of the grant. We therefore construe the language as precatory, especially as opposed to an interpretation that would impose a duty on the grantee that the United States intended to enforce.

### (b)

◼ Our conclusion that no binding trust was created by the 1822 Act is also supported by trust law. Under generally accepted trust principles, precatory language is insufficient to create binding obligation upon the State. *See* Rest. (II) Trust §§ 25 and 125. That is, a fundamental tenet of trust law is that "no trust is created unless the settlor manifests an intention to impose *enforceable* duties." [23] (emphasis ours) More importantly, § 125 of the Restatement provides that, "If property is transferred to a person to be disposed of by him in any manner or to any person he may select, no trust is created and the trans-

feree takes the property for his own benefit."

This description applies to Sixteenth Section lands. The Supreme Court has made quite clear that the power of the states over Sixteenth Section lands is "absolute," and "without limitation." *See Cooper, supra; Schmidt, supra.* Moreover, numerous Mississippi Supreme Court cases support this interpretation. *See, e.g., Street v. City of Columbus,* 75 Miss. 822, 23 So. 773, 774 (1898) ("As we have said, advisedly, the state, after its admission into the Union, took not only the title in trust to these lands, but it took absolute control of them. In the exercise of its will, some of the sixteenth-section lands were sold out right to private persons, and title vested in them in fee"); *Pace v. State,* 191 Miss. 780, 4 So.2d 270, 280 (1941) ("the state had the right to sell these lands in fee simple prior to the adoption of the Constitution of 1890"); *Lambert v. State,* 211 Miss. 129, 51 So.2d 201, 203 (1951) (prior to 1890, "the Legislature had authority to execute the trust for school purposes at its discretion. [A]t that time the method of the execution of the trust was for the decision of the legislature"); *Connell v. Woodward,* 6 Miss. (5 How.) 665, 672 (1841) (the Legislature's power "has been so long recognized and acted on, that we did not feel inclined to question it," and noting that Congress had never objected to the state's actions). Accordingly, under principles of trust law, no binding trust was created by the Sixteenth Section reservation in the 1822 Act, and the State of Mississippi took title "for its own benefit."

---

**23.** Restatement (Second) of Trusts § 25. The comments to § 25 explain that

> On the one hand, the settlor may manifest an intention to create a trust; on the other hand, his manifestation of intention may amount merely to a suggestion or wish that the transferee should use or dispose of the property in a certain manner, leaving it to the transferee's desires to do so. No trust is created if the settlor manifests an intention to impose merely a moral obligation.

Furthermore, in determining the intent of the settlor, § 125 comment (a) states that

> Whether the transferor has manifested an intention to give property to a person in trust or to give it to him for his own benefit is a

question of interpretation of the transferor's language in the light of all the circumstances. No trust is created if the transferor does not manifest an intention to impose enforceable duties upon the transferee. His intention not to impose enforceable duties may be shown by the fact that he uses precatory rather than mandatory words. Even though the purpose to which he desires the transferee to apply the property is clearly something other than for the personal benefit of the transferee, no trust is created if the settlor manifested an intention to impose merely a moral obligation, and to leave the transferee free from any legal obligation to apply the property to the purpose.

### (c)

Finally, the district court, citing *Cooper* and *Schmidt,* characterized the State of Mississippi's obligation with respect to using the land for school purposes as simply "honorary"[24] or "sacred." We also accept these cases as establishing the authoritative view that there was no congressional policy to place binding trust obligations as a burden upon the disposition of Sixteenth Section lands. We find nothing unique or different about the language used in the 1822 Act that would suggest that Congress intended for the lands acquired by the Treaty at Doak's Stand to be treated differently from any other lands acquired by Mississippi or Alabama.

### D

Given the properly construed language used in the 1822 Act, and in the light of the purpose and intent behind Sixteenth Section school land reservations, we hold that the Sixteenth Section lands in Madison County were held by the State of Mississippi in honorary trust. That is, although the state was morally obligated to use the land to advance education, the power of the State of Mississippi over this land was absolute and no binding trust obligations were placed on the state. In short, the state possessed these lands in fee simple from 1825 forward (the year the survey was completed pursuant to the 1822 Act). Accordingly, the 1852 Act, which proscribed the sale of certain Sixteenth Section lands without the consent of the inhabitants of the township, was not a burden on the title to these Madison County lands when conveyed to the Y & MVRR by the Charter in 1882. The supremacy clause was therefore not violated by the disposition of these lands.

### V

We now turn to the state law related challenges to the Charter. MCBE argues that, even assuming the State took title from the United States in 1822 without limitation, the State of Mississippi itself, through its state constitution, placed binding trust obligations upon the land that were violated by the Charter. If a state-created trust was in effect in 1882, the Charter, by donating the lands to the Y & MVRR, may have violated the terms of that trust.

In support of this contention, MCBE cites numerous Mississippi cases that suggest that Sixteenth Section lands are held by the State in binding trust. *See, e.g., Keys v. Carter,* 318 So.2d 862, 864 (Miss. 1975); *Tally v. Board of Supervisors of Smith County,* 323 So.2d 547 (Miss.1975); *Bragg v. Carter,* 367 So.2d 165, 167 (Miss. 1979); and *Hill v. Thompson,* 564 So.2d 1 (Miss.1989). We acknowledge that the State of Mississippi has treated some Sixteenth Section lands as trust property. Today, however, we are only presented the question whether the Charter, which was passed in 1882, contravened any state-created trust that had been imposed on the lands in question. Because the Charter was passed by an act of the Mississippi Legislature, we look only to the Mississippi Constitution for trust obligations that were effective in 1882 over Sixteenth Section lands.

The State of Mississippi's first constitution in 1817 severely restricted the alienation of Sixteenth Section lands, providing that "no lands granted for the use of such township's schools, shall ever be sold by any authority in this state." Miss. Const. art. VI, § 20 (1817). Following the acquisition of the lands in Madison County, however, the State adopted two new and substantially different Constitutions—in 1832

---

**24.** Black's Law Dictionary defines "honorary trust" as a trust for specific non-charitable purposes where there is no definite ascertainable beneficiary and hence unenforceable in the absence of statute." As applied to public offices and other positions of responsibility or trust, this term means either that the office or title is bestowed upon the incumbent as a mark of honor or complement, without intending to charge him with the active discharge of the duties of the plan.... In other contents or usages, it means attaching to or growing out of some honor or dignity or honorable office, or else it imports in obligation or duty growing out of honor or trust only as distinguished form legal accountability.

306

and again in 1869. In contrast to the 1817 Constitution, these new Constitutions did not include restrictions on the sale of Sixteenth Section lands. Indeed, the 1869 Constitution specifically revoked all provisions contained in the earlier Constitutions. The State of Mississippi did not again restrict the sale or alienation of Sixteenth Section lands until the adoption of the Constitution of 1890, eight years after the Mississippi legislature passed the Charter. *See Lambert v. State*, 211 Miss. 129, 51 So.2d 201, 203 (1951).

In sum, in 1882, when the legislature granted the right-of-way to the Y & MVRR, there was no state constitutional provision that would invalidate the Charter. All cases relied upon by MCBE address Sixteenth Section land sales or leases that post-date the 1890 Constitution. Consequently, those cases are inapposite to the question today. We thus conclude that Mississippi law placed no binding trust obligation or other burden on the Sixteenth Section lands to prevent the Legislature from validly passing the Charter in 1882.

### VI

We now turn to MCBE's final arguments. MCBE argues that even if the Sixteenth Section lands were subject to the Charter, the State, as trustee of these lands, could not have lawfully donated them to a private railroad without compensation to the beneficiaries of the trust, i.e., the school children of Madison County. MCBE argues that granting the right-of-way without cash compensation amounted to a donation of the land, and that the donation did not directly benefit the school children of Madison County. Again, this argument is premised upon an assumption that a binding trust was created by the 1822 Act. Because no binding trust was created, the State legislature acted within its lawful power.

In any event, however, we are persuaded that the passage of the Charter did not violate the moral obligations imposed on the State to use the Sixteenth Section school lands for the benefit of the schools. Initially, we should observe that the class to be benefited from the Sixteenth Section honorary trust is not specifically restricted to the school children of the township. We indicated in *Joyce* that, "The beneficiaries of the appropriation or dedication of the sixteenth section for the support of schools were, not the United States, but *the future state in which the townships would be, and the inhabitants of such townships." Joyce*, 261 F. at 131 (emphasis ours). The building of the Y & MVRR railroad clearly benefited the educational opportunities of both the State of Mississippi and the inhabitants of this particular township of Madison County. Railroads were the primary means of modern transportation in the 1880s both for people and goods, for imports and exports. We find it incredible to suggest that the inhabitants and public schools of Madison County did not benefit from railroad construction. The influx of population and businesses, which certainly followed from the presence of a railroad through the county, were sources of revenue and people for new and better schools. For example, the wonderful little town of Flora, in Madison County, grew up around the Y & MVRR depot on the Sixteenth Section in question. To be sure, the conveyance of this land to the railroad to induce it to construct a line through Madison County may have well been the highest and best use to which this land could have been put in 1882 in order to serve the educational opportunity in the township.[25] We are thus satisfied that the mode adopted in the Charter to exercise the State's unlimited power to use and dispose of these lands did not disregard the honor-

---

**25.** Irrespective of this conclusion, however, we would not lightly revisit the question of sufficient consideration one hundred and nine years after the fact. The Mississippi legislature concluded that without a grant of the right-of-way, a railroad might not have been built. We would hesitate to question today the wisdom of the legislature in exercising its plenary power under the 1882 Act. We should emphasize, however, that we do not question the decisions of the Mississippi Supreme Court that have addressed similar issues arising after the passage of the 1890 Constitution.

ary obligation to use the lands for the support of schools.[26]

## VII

We thus bring this opinion to its end and hold that the State of Mississippi acquired title in fee simple to the Sixteenth Section lands in Madison County following the completion of the 1822 Act survey. The State of Mississippi took title, however, subject to an honorary trust to use the Sixteenth Section lands for the benefit of the schools. Because the trust created only a moral obligation to use the lands for the benefit of the schools, the State's power over the land was absolute and without limitation. Moreover, because the State of Mississippi and the township inhabitants benefited significantly from the railroad in increased educational opportunities, the Charter did not violate the sacred principles espoused in the honorary trust placed on these lands. The Charter thus lawfully conveyed valid title to the Y & MVRR and the Illinois Central now possesses in fee simple absolute the right-of-way crossing this Sixteenth Section in Madison County. The judgment of the district court is therefore

AFFIRMED.

---

**26.** MCBE's final argument is that the Charter did not convey Sixteenth Section lands because these lands do not fall within the realm of "lands belonging to" the State of Mississippi as specified by the terms of the Charter. Specifically, MCBE argues that the phrase "lands belonging to the State" only includes that land where the State owns both legal and equitable title. Like MCBE's other arguments, this contention is premised upon there being a binding trust on the Sixteenth Section lands. The district court rejected this argument, holding that the state "had authority to subject the Sixteenth Section lands in its hands to the ordinary incidents of other titles of the state." *See Alabama v. Schmidt,* 232 U.S. at 174, 34 S.Ct. at 303. We agree. Because the State of Mississippi acquired title to the Sixteenth Section lands in fee simple with only a moral obligation attached, the Legislature was empowered to transfer both legal and equitable title to the Y & MVRR via the Charter. *See* Rest. (II) Trust § 125. This argument, therefore, lacks merit.