IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 00-60245

J. RANDOLPH LIPSCOMB, on behalf of himself and all
others similarly situated; MAYOR, CITY OF COLUMBUS;
CITY COUNCIL OF THE CITY OF COLUMBUS, MISSISSIPPI,
as the statutorily designated successors in office
to the Trustees of Franklin Academy,

                                        Plaintiffs-Appellees,

                    versus

THE COLUMBUS MUNICIPAL SEPARATE SCHOOL DISTRICT,
etc.; ET AL.,

                                        Defendants,

                    versus

STATE OF MISSISSIPPI; ERIC CLARK,
In his capacity as Secretary of State,

                                        Defendants-Appellants.

Appeal from the United States District Court
For the Northern District of Mississippi

October 3, 2001

Before REYNALDO G. GARZA, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

     This case requires us to examine a collision between the
Contract Clause of the United States Constitution and Mississippi's
effort to escape rent and renewal terms of leases of sixteenth
section land in Columbus, Mississippi dating back to the early

nineteenth century.  The Secretary of State of Mississippi and the State maintain that the rental and renewal terms are invalid because their perpetuation of rents that are now nominal violate a provision of the 1890 Mississippi Constitution forbidding the donation of public property to private parties.  Lipscomb sues for a declaration that the efforts of the Secretary of State to invalidate these leases  violates the Contract Clause.  The district court held that invalidating the leases would violate the Contract Clause.  We affirm.

I

Before Mississippi became a state, the United States Congress set aside the sixteenth section of every township in the Mississippi Territory to be used for the benefit of schools.[1] Congress then authorized the leasing of the sixteenth section land to raise funds to finance public schools in the Mississippi Territory.[2]  Upon granting statehood to Mississippi in 1817, Congress gave the sixteenth section land to the new State for the

---

[1] Act of March 3, 1803, 2 Stat. 233-34.  Sixteenth sections were not set aside in northern Mississippi until 1817, *see* Act of March 3, 1817, 3 Stat. 375, and "lieu lands" were provided for sixteenth sections that were unavailable for various reasons. *See, e.g.,* Act of July 4, 1836, 5 Stat. 116 (Chickasaw Cession Lieu Lands).  The creation of sixteenth section lands and lieu lands is discussed in *Papasan v. Allain*, 478 U.S. 265, 268-73 (1986).

[2] Act of Jan. 9, 1815, 3 Stat. 163 (providing for leasing certain lands reserved for the support of schools in the Mississippi territory).

benefit of its schools.[3]  Thereafter, the Mississippi legislature authorized the leasing of the school lands, the proceeds of which would finance public schools.[4]

In the early-to mid-1800s, various persons leased sixteenth section land from the school board of Columbus, Mississippi.  These leases were to last 99 years from February 10, 1821, or thereabouts (regardless of when actually made) and contained "renewable forever" provisions authorized by an 1830 Mississippi statute.[5] Many of the leases—often after being assigned or subdivided—were renewed in 1920 under their renewable forever provisions.  The rental rates paid on the Columbus leases have remained unchanged for one hundred eighty years.  Leaseholders of lots of property in downtown Columbus pay pennies in rent per year, a small fraction of their fair market rent.

In 1890, Mississippi ratified its current constitution. Section 95 of the 1890 constitution prohibits the donation of state lands to private parties.[6]  Mississippi courts subsequently interpreted section 95 to prohibit leases or sales of land for

---

[3] *Papasan*, 478 U.S. at 271.

[4] *See* Miss. Const. of 1817, art. 6, § 20; Act of Feb. 10, 1821, 1821 Miss. Laws, 4th Sess., Ch. XLVI (authorizing a lease of certain Town Lots therein named, and for other purposes).

[5] Act of Dec. 13, 1830, 1830 Miss. Laws, 14th Sess., Ch. II.

[6] Miss. Const. of 1890, art. 4, § 95 ("Lands belonging to, or under the control of the state, shall never be donated directly or indirectly, to private corporations or individuals, or to railroad companies.").

grossly inadequate consideration.[7]  A lease that violates section 95 is voidable.[8]  Following these rulings, the State and individual school boards began asserting that sixteenth section leases for nominal consideration were void and renegotiating the leases.  The leases in Columbus, Mississippi, however, occupy a unique position: because the "renewable forever" leases in Columbus were signed before the ratification of the 1890 Mississippi Constitution, voiding the leases implicates the Contract Clause of the United States Constitution.[9]

J. Randolph Lipscomb brought a declaratory judgment action in federal court seeking certification of a class of leaseholders and a declaration that the State's threatened action to void the leases and renegotiate would violate the Contract Clause.  He originally named the Secretary of State of Mississippi, the State of Mississippi, the Columbus School Board, and the U.S. Department of Housing and Urban Development[10] as defendants.[11]

---

[7] *See, e.g., Hill v. Thompson*, 564 So. 2d 1, 9 (Miss. 1989).

[8] *Id.* at 12.

[9] U.S. Const. Art. I, § 10, cl. 1.

[10] Lipscomb alleged that in response to the State's declared intention to void the leases, HUD had declared the leased lands "uninsurable," thereby causing the leaseholders harm.

[11] The School District has since been realigned as a plaintiff, and HUD remains only as a "nominal" defendant.  We will refer here often to the remaining defendants collectively as the State.

The district court certified the class, but then abstained under the *Pullman* and *Burford* doctrines. This Court reversed the ruling on abstention and remanded.[12] The district court redefined the class and ultimately granted summary judgment in favor of Lipscomb, declaring, in relevant part, that (1) "renewable forever" in the Columbus sixteenth section leases means all rental covenants, including the lease rate, are renewable forever, (2) the Contract Clause of the United States Constitution applies to the leases in this case, (3) voiding the leases under section 95 of the Mississippi Constitution would violate the Contract Clause. The Secretary of State and the State of Mississippi appeal that ruling.

II

The State challenges federal jurisdiction on several grounds, and we turn first to that question.

A. Subject Matter Jurisdiction

The State argues that the district court lacked subject matter jurisdiction because there is no federal question and the federal defendant, HUD, has no case or controversy with the plaintiffs.[13]

_____

[12] *See Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 145 F.3d 238, 240-42 (5th Cir. 1998). The broader history of the leasing of state lands for the benefit of schools is discussed below, in the context of the Contract Clause analysis. *See* Part IV.A.

[13] The State contends that the leases are in fact taxes, and thus the federal courts are barred by the Tax Injunction Act, 28

5

Specifically, the State claims that the Supreme Court's decision in *Public Service Comm'n v. Wycoff*[14] precludes federal jurisdiction under 28 U.S.C. 1331 and the well-pleaded complaint rule.[15] We disagree.

In *Wycoff*, the plaintiffs sought a declaratory judgment that their activities constituted interstate commerce so as to insulate them from state regulation. The Court held that when "the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court."[16] The State contends that Lipscomb has similarly attempted to evade the well-pleaded

U.S.C. § 1341, from entertaining a challenge to the state's actions to collect on the leases. This contention is without merit. The lease obligations are a creature of contract, not a mandatory obligation imposed by the state as taxes are. *See New Jersey v. Anderson*, 203 U.S. 483, 492 (1906). Although the determination of what is a "tax" is ultimately a question of federal law, *Neinast v. State of Texas*, 217 F.3d 275, 278 (5th Cir. 2000), we note that the Mississippi Supreme Court has characterized the leases as leases rather than taxes. *See Street v. City of Columbus*, 23 So. 773, 774 (Miss. 1898). The appellants also note that the lease payments are collected by the taxing authorities. This court has previously rejected this reasoning: "This formalism is unhelpful. . . . [T]he question is not where the money is deposited, but the purpose of the assessment." *Neinast*, 217 F.3d at 278.

[14] 344 U.S. 237, 248 (1952).

[15] *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149 (1908).

[16] *Wycoff*, 344 U.S. at 248.

6

complaint rule, by anticipating the Secretary of State's judicial action. Since the state legislative action giving rise to Lipscomb's claim is the Mississippi Constitution of 1890, Lipscomb's complaint does not anticipate a state judicial action, it seeks redress for an existing harm.[17] To the point, the threatened action is legislative impairment of contract.

## B. Eleventh Amendment Immunity

The State for the first time seeks a dismissal on grounds of sovereign immunity. Lipscomb counters that the State has waived its Eleventh Amendment immunity and, in the alternative, that *Ex parte Young*[18] saves the claim for declaratory relief against the Secretary of State, even if the State of Mississippi must be dismissed. We address these contentions in reverse order.

*Ex parte Young* of course offers an exception to the State's Eleventh Amendment immunity. That is, state immunity is no bar to enjoining a proper state official from unconstitutional acts. Lipscomb seeks not damages but a declaration that voiding the leases would violate the Contract Clause. In function, this requested relief is indistinguishable from a suit to enjoin the Secretary from declining to abide the challenged lease terms. While such a declaration will not support coercive, retrospective

---

[17] *See* infra n. 32

[18] 209 U.S. 123 (1908).

relief or  money damages when confronted by the Eleventh Amendment, it will support injunctive relief.

The Secretary of State argues, however, that the suit implicates the State's ownership of land in a manner that takes it outside the *Ex parte Young* exception, as in *Idaho v. Coeur d'Alene Tribe of Idaho.*[19]  In *Coeur d'Alene* the Supreme Court held that a claim to the ownership of submerged waters brought against the state is barred by the Eleventh Amendment, even though no damages were sought.  The Court emphasized that the requested declaration would strip the state of its jurisdiction and regulatory control over the lands.[20]  The Court also noted that state control over submerged lands was a special incident of sovereignty with deep historical roots.[21]

We are not persuaded *Coeur d'Alene* controls here.  The Supreme Court relied on two interrelated factors: First, the Court noted that the Eleventh Amendment bars a quiet title action in federal court absent the state's consent.[22]  The tribe claimed ownership and exclusive occupancy of the lands and was seeking invalidation of all state laws regulating the land.  It conceded that its suit was the functional equivalent of a quiet title action.  Second, the

---

[19] 521 U.S. 261 (1997).

[20] *Id.* at 281-83.

[21] *Id.* at 282-87.

[22] *Id.* at 281-82.

8

Court emphasized that the relief sought would have been an affront to the state's sovereignty. Because the tribe was a distinct sovereign, not only would quieting title in the tribe divest the state of ownership over the land, it would strip the state of all of its jurisdiction and power over the land.[23]

We find our case distinguishable. Lipscomb did originally seek to quiet title, but he abandoned that claim. His amended complaint seeks only a declaration that the invalidation of the price terms of the leases is prohibited by the Contract Clause of the Constitution. The contention that the requested relief would be an affront to state sovereignty is not convincing. Mississippi would retain jurisdiction over the leased lands; indeed, title to the lands would remain in Mississippi. The State's basic police and taxing power would not be affected.

The Tenth Circuit found similar distinctions from *Coeur d'Alene* in a case resembling this one. In *Elephant Butte Irrigation District of New Mexico v. Department of Interior*,[24] it denied an Eleventh Amendment challenge to a suit over the distribution of profits from land leases to various governmental

---

[23] *Id.* at 282 ("[T]he far-reaching and invasive relief the Tribe seeks . . . go[es] well beyond the typical stakes in a real property quiet title action."). The majority opinion treated these two factors in tandem. Justice O'Connor's concurring opinion distinguishes these factors and discusses them at greater length. *See id.* at 288-91.

[24] 160 F.3d 602 (10th Cir. 1998).

bodies.  The court acknowledged that the suit involved property interests of the state, but noted that it was not a suit to quiet title, and the "special sovereignty interests" present in *Coeur d'Alene* did not exist.[25]  Instead, the Tenth Circuit noted, the only interest of the state at stake was its relatively mundane interest in the distribution of lease income.[26]

In sum, Lipscomb's suit is not to quiet title, nor would the granting of relief strip the state of any of its jurisdiction or authority to regulate the land.  While it would prevent the state from charging current market rates for rent on renewal, it does nothing to frustrate state taxation of the leasehold – a reality to which we will return.  As such, the *Ex parte Young* doctrine applies, and the Eleventh Amendment does not deprive federal courts of jurisdiction to entertain this suit against the Secretary of State.  This renders moot the claim for the same relief asserted directly against the state, and we need not address that claim further.

III

Before turning to the question of whether the Contract Clause bars invalidation of the lease terms, we must examine a preliminary question of whether refusing to honor the renewal and price terms

---

[25] *Id.* at 608-09, 611-12.

[26] *See id.* at 612.

implicates the Contract Clause at all. A violation of the Contract Clause rests on the assertion that the current leases were in place before the 1890 Mississippi Constitution. The Secretary argues that renewals of the leases in 1920 changed the contract terms to an extent that they were new contracts rather than renewals. The Secretary's argument is that the price terms on the contracts have changed—that the contracts were altered, not merely renewed. If so, the Secretary concludes, there can be no Contract Clause violation, because the plaintiffs do not hold leases with price terms that preexisted the 1890 Mississippi Constitution.

Lipscomb replies that changes in the price terms reflected subdivision of the land, and lower price terms for contracts for smaller plots represented pro rata division of the original lease price.[27] Lipscomb also notes that the leases were labeled "renewals" and thus we may conclude that they were in fact renewals.

We agree with the district court that the defendants failed to create a genuine issue of material fact on this issue. Lipscomb presented evidence that the leases were labeled "renewals." This view is consistent with the 1830 statute that authorized the trustees of Franklin Academy to make all the leases at issue in

---

[27] A state statute allowed lessees to subdivide their leases. Act of January 28, 1846, 1846 Miss. Laws, (Regular Sess.) Ch. 143.

this case renewable forever.[28]  Further, although the leases were divided and re-divided, increasing the difficulty of determining whether their rents changed over time, Lipscomb presented evidence that the aggregate rentals on the lands in question did not change before and after 1920.  The State responded only with evidence that the per-acre rents changed over time.  This is not relevant, since allocation of rentals on sub-divided pieces of leased land could rest on the quality of each lot rather than its area.  For example, a two-acre lot rented for two dollars a year could be divided into two one-acre lots, one of which rented for $1.20 and one of which rented for $0.80.  Even though the rent-per-acre went up in one lot and down in the other, the rental rate of two dollars for two acres

---

[28] Act of Dec. 13, 1830, 1830 Miss. Laws, 14th Sess., Ch. II. The State claims that this statute only authorized the creation of leases that were renewable forever and that it did not make previously created leases renewable forever or allow those leases to be terminated and then renegotiated with renewable forever provisions.  The State argues that the statute provides that the only way a prior lease can be renewed forever is at the end of its lease term.  The State misreads the statute.  It states: "*And be it further enacted*, That the Trustees of said Franklin Academy ... be, and are hereby authorized to make out all leases for the lots of [sixteenth section land in Columbus], for ninety nine years, dating from the first leasing of lots in said town of Columbus, renewable forever.... *[A]nd that all leases heretofore made of lots, by the said Trustees, be renewable at the expiration of the time for which they were leased, in like manner as above, provided for, in cases of lots to be leased hereafter*." *Id*. (emphasis added). The statute is silent on the surrender or termination of pre-existing leases. As the defendant's note, the statute may well have induced holders of pre-1830 leases to surrender them, so as to gain the benefits of the renewable forever provisions that were now authorized.  The simple fact remains that the leases here at issue contain renewable forever terms authorized by this statute.

12

did not change.  The difference in rent between the two lots could reflect the value of each lot's location, the quality of its soil, access to water or roads, or other differences.  The precise reasons for such differences in valuation are irrelevant.  The State thus has failed to create a genuine issue of material fact that subdividing or releasing lands changed their rental rates.  We accept the district court's conclusion that the 1920 leases were renewals and at last reach the question of the limits imposed by the Contract Clause.

IV

1

The 1890 Mississippi Constitution, section 95, states, "Lands belonging to, or under the control of the state, shall never be donated directly or indirectly, to private corporations or individuals, or to railroad companies."[29]  Mississippi courts have consistently construed this to forbid transactions for consideration so inadequate that they are the equivalent of donations.[30]  The Mississippi Supreme Court, in *Hill v. Thompson*,[31] held that a sale or lease of sixteenth section land that violates

---

[29] Miss. Const. of 1890, art. 4, § 95.

[30] *See, e.g., Hill v. Thompson*, 564 So. 2d 1, 9 (Miss. 1989) (reviewing cases).

[31] 564 So. 2d 1 (Miss. 1989).

section 95 is voidable.[32]  However, the Mississippi Supreme Court, in interpreting section 95 to make certain sixteenth section land leases voidable, has invoked equity and held that even when a lease is voided, the leaseholder retains the right of first refusal after the land is appraised for fair rental value.[33]

In sum, the Secretary of State has sought, under section 95, the invalidation of leases of sixteenth section lands throughout Mississippi.  The sixteenth section land leases in Columbus, Mississippi, however, are renewals of leases signed before the ratification of section 95 of the 1890 Mississippi Constitution. Thus, Lipscomb argues for a declaration that this effort to invalidate the leases in Columbus violates the Contract Clause of the United States Constitution.

2

Article I, section 10 of the U.S. Constitution states, "No State shall ... pass any ... Law impairing the Obligation of Contracts."[34]  The Supreme Court has emphasized, however, that the

---

[32] *See id.* at 9.

[33] *See id.* at 12.

[34] U.S. Const. Art. I, § 10, cl. 1.  The defendants argue that the Contract Clause is not implicated by this lawsuit because the alleged impairment of the leases was not caused by the legislative act of enacting the 1890 Mississippi Constitution, but by the judicial act of the Supreme Court of Mississippi in deciding *Hill*. The defendants are correct in claiming that only legislative actions, not judicial actions, can create a viable Contract Clause claim.  *See Tidal Oil Co. v. Flanagan*, 263 U.S. 444, 451 (1924); *Frazier v. Lowndes County, Mississippi, Bd. of Educ.*, 710 F.2d

absolute language of the Contract Clause does not create an absolute prohibition; a State must be given some accommodation in passing laws "to safeguard the vital interests of its people."[35] The Supreme Court has developed a three-part test to balance the State's obligation not to impair contracts with its interest in public welfare. These three are applied against the backdrop of legislative power to exercise eminent domain. That a state legislature has by statute given assurance that it would not do so does not mean that the legislature cannot later take the property by eminent domain or paying just compensation.[36] That is, we address a claim of police power to regulate – without compensation. And while impairment of contract analysis has an air of due process about it, our analysis is distinct.

First, "[t]he threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship."[37] In considering whether an impairment to contract

---

1097, 1099 (5th Cir. 1983). But the impairment stems from the "no donations" clause of the 1890 Mississippi Constitution that the *Hill* court interpreted, not from the *Hill* decision itself, which merely engaged in constitutional construction. Our prior opinion in *Lipscomb* said as much. *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 145 F.3d 238, 243 n.4 (5th Cir. 1998).

[35] *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983).

[36] *See West River Bridge Co. v. Dix*, 6 How. (47 U.S.), 507 (1848).

[37] *Id.* at 411 (internal quotations omitted).

15

is substantial, the court should consider the expectations of the parties with respect to changes in the law.[38] Particularly relevant to this inquiry is whether the subject matter of the contracts had been subject to regulation at the time the contracts were made.[39] A "regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute substantial impairment."[40] The court should also consider what terms of the contract are affected and the duration of the effects.[41]

Second, if we find a substantial impairment of contractual rights, we must consider the justification offered by the State for its impairment of the contract.[42] A State can only justify a substantial impairment of contracts with a "significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem."[43] The problem need not be "an emergency or temporary situation,"[44] and

---

[38] *See Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 894 (7th Cir. 1998).

[39] *See Energy Reserves Group*, 459 U.S. at 411.

[40] *Id.*

[41] *Cf. Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245-47 (1978) (describing example of a severe impairment of contractual rights).

[42] *See Energy Resources Group*, 459 U.S. at 411.

[43] *Id.* at 411-12.

[44] *Id.* at 412.

"the elimination of unforeseen windfall profits" is a legitimate state interest sufficient to justify state impairment of contracts.[45] The requirement that the problem be "broad and general" ensures "that the State is exercising its police power, rather than providing a benefit to special interests."[46] The scrutiny to which the court subjects the state law is proportional to the degree of impairment.[47]

Third, if the State presents a legitimate justification for the impairment, we determine whether the impairment is reasonable and necessary. "Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption."[48] In cases involving impairment of contracts between private parties, the court does not independently

---

[45] *Id.*

[46] *Energy Reserves Group*, 459 U.S. at 412.

[47] *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ("The severity of the impairment measures the height of the hurdle the state legislation must clear."). In *Allied Structural Steel*, the Supreme Court noted that the challenged legislation "worked a severe, permanent, and immediate change in [the contractual] relationships—irrevocably and retroactively." *Id.* at 250. The Court had little hesitation in striking down such legislation when it (1) interfered with a previously unregulated field, (2) was directed at a small subset of employers, rather than business in general, and (3) did not even purport to be a necessary step in remedying a social or economic problem. *See id.* at 247-50.

[48] *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 22 (1977); *see also Energy Reserves Group*, 459 U.S. at 412.

17

review the reasonableness of the legislation; it should defer to the judgment of the legislature.[49]

However, when the State is a party to the contracts, the court cannot defer to the State because the State's self-interest as a party is implicated.[50] Instead, the court must engage in a two-part inquiry. First, the court should determine whether the contracts surrender "an essential attribute of [the State's] sovereignty."[51] If so, the Contract Clause does not prevent the State from impairing such an obligation, because "the legislature cannot bargain away the police power of a State."[52] Purely financial obligations, however, do not surrender aspects of the State's sovereignty, and thus are subject to the Contract Clause.[53] Second, even if the impairment is subject to the Contract Clause, the court must determine whether the impairment is "reasonable and necessary," without giving "complete deference" to the legislature's judgment.[54]

---

[49] *Energy Reserves Group*, 459 U.S. at 412.

[50] *United States Trust Co.*, 431 U.S. at 25-26.

[51] *Id.* at 23.

[52] *Id.*

[53] *See id.* The Supreme Court has held that "any substantial alteration by subsequent legislation of the rights of a purchaser at a tax sale, accruing to him under laws in force at the time of his purchase, is void as impairing the obligation of contract." *Wood v. Lovett*, 313 U.S. 362, 369 (1941).

[54] *United States Trust Co.*, 431 U.S. at 25-26.

In sum, the court must first determine whether the impairment of the contract is substantial and the degree of that impairment. If the impairment is not substantial, there is no claim under the Contract Clause.[55]  The court must next assess the strength of the State's justification for the impairment.  The justification must identify a public purpose that is significant and legitimate.  If the State fails to provide such a justification, the impairment violates the Contract Clause.[56]  Finally, the court must compare the impairment and the justification to determine whether the impairment is "reasonable and necessary."  The degree of deference shown the legislature's judgment on this question depends on whether the government has impaired contracts to which it is a party.

3

We begin by asking whether section 95 substantially impairs the contractual rights of the leaseholders.  To determine the effect of a law on a contract, we must identify which contractual rights are being affected by the law, and then consider the extent to which the law has contravened the reasonable expectations of the parties.  Section 95 affects the renewal rent term.  As read by the Mississippi Supreme Court section 95 makes voidable the current

---

[55] *See, e.g., City of El Paso v. Simmons*, 379 U.S. 497 (1965). This case is discussed at length below.

[56] *See, e.g., Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978).

lease price, allowing the State to seek a fair market rate, but giving the current leaseholder the right of first refusal.[57] The actual impairment to the leases is the invalidation of the "renewable forever" clauses that guaranteed a continuation of the original price term to the present day. Section 95 thus impairs the contract term that freezes the rents at prices that the State contends have become grossly inadequate with the passage of time.

Given that section 95 affects the renewal price term, we must ask what the reasonable expectations of the contracting parties were with respect to that contract term. The renewable forever clauses are authorized by state statute.[58] Additionally, the leases were made in furtherance of the State's duty to preserve the value of the school trust lands. The leases in this case were signed in

---

[57] Because the Mississippi Supreme Court has held that the leases are voidable, rather than void, the State has no right to seek foregone rent from past years. *See Hill*, 564 So.2d at 9.

[58] The Mississippi legislature passed numerous statutes regulating the leasing of sixteenth section land in the years after the creation of the State. Legislation in 1821 and 1830 authorized the leases in this case. *See* Miss. Const. of 1817, art. 6, § 20; Act of Feb. 10, 1821, 1821 Miss. Laws, 4th Sess., Ch. XLVI; Act of Dec. 13, 1830, Miss. Laws 14th Sess. Ch. II. The Mississippi legislature altered the regulation of Mississippi sixteenth section lands throughout the 19th century. *See, e.g.,* Act of Feb. 10, 1830, 1830 Miss. Laws Ch. XXIV; Act of December 16, 1830, 1830 Miss. Laws 14th Sess. Ch. II; Act of Feb. 27, 1833, 1833 Miss. Laws [pp.452-54]; Act of January 28, 1846, 1846 Miss. Laws, (Regular Sess.) Ch. 143. Indeed, since the nineteenth century, the Mississippi legislature has continued to place a great importance on the management of sixteenth section lands. *See* Act of March 20, 1914, Miss. Laws Ch. 462.

the 1820s, 1830s, and 1840s, against a backdrop of the State's binding trust obligations.

4

The nature of the trust is here relevant in two ways: first, the extent of the State's trust obligations in the management of the sixteenth section lands affects the strength of Mississippi's interest in regulating those lands; second and relatedly, the fetters of trust obligations bear on the reasonable expectations of the parties to the leases on their execution – the strength of the facially unqualified obligation to renew.

Since its earliest days, Mississippi has held sixteenth section lands in trust for the benefit of the schools of the State. Although courts often refer to "the" trust, there are in fact two trusts—one state, one federal—in which Mississippi holds its sixteenth section lands. Detailing this duality is necessary to understanding Mississippi's trust obligation. We turn first to the federal trust.

Beginning with the Northwest Territory in 1785, Congress set aside public lands in most of the territories of the United States to  be used for the benefit of territorial schools. The lands set aside were composed of the sixteenth section of each township; in later years, additional sections were set aside as well. As states were formed out of territories, Congress, in the enabling act of

each new state, granted the school lands to the state.[59]  These grants contain language that the land is being given to the state for the benefit of its schools.  This is the source of the claim that the states hold the school lands in a federally created trust.[60]

In defining the character of any federal trust, we then first turn to the language of the statute granting the sixteenth section lands to the State and their interpretation.  Earlier grants of sixteenth section did not contain any language creating specific obligations on the part of the states.[61]  The Supreme Court long ago held that such grants gave the sixteenth section lands to the states in fee simple;[62] the federal trust was purely honorary.[63]

---

[59] Thus, almost every state aside from the original thirteen has sixteenth section lands. *See Andrus v. Utah*, 446 U.S. 500, 522 (1980) (Powell, J., dissenting); *see also* P. Gates, *History of Public Land Law Development* 287-88 (1968).

[60] For a more extensive discussion of the history of sixteenth section lands, see *Papasan v. Allain*, 478 U.S. 265, 268-70 (1986); *Andrus v. Utah*, 446 U.S. at 522-24 (Powell, J., dissenting); Semmes Luckett, *Mississippi's Sixteenth Section School Lands*, 23 Miss. L. J. 281 (1962).

[61] *See, e.g.,* Act of March 3, 1817, 3 Stat. 375 ("[S]ection No. 16, in each township, [ ] shall be reserved for the support of schools therein.") (Mississippi enabling act); Act of Feb. 14, 1859, 11 Stat. 383 ("[S]ections numbered sixteen and thirty-six in every township of public lands ... shall be granted to said State for the use of schools.") (Oregon enabling act).

[62] *Cooper v. Roberts*, 59 U.S. 173, 181-82 (1855).

[63] *See Alabama v. Schmidt*, 232 U.S. 168, 173-74 (1914).  The Fifth Circuit long ago held that the statute creating Louisiana's sixteenth section land, Act of March 3, 1811, 2 Stat. 662 (the

22

Some later land grants—those to Arizona and New Mexico, for example—were worded to create very specific rights and duties of the United States and the state.[64]  The Supreme Court has treated these grants as binding trusts.[65]

The grant of sixteenth section land to Mississippi was one of the earliest trusts created, and contained no language establishing a binding trust.  We remain convinced then that the federal trust in which Mississippi holds its sixteenth section lands is purely honorary,[66] that Mississippi holds absolute title to the land without federal restriction and we turn to the matter of trust obligations imposed by the law of Mississippi.

---

sixteenth section "shall be reserved in each township, for the support of the schools within the same"), created only an honorary trust.  *See Louisiana v. William T. Joyce Co.*, 261 F. 128, 130, 133 (5th Cir. 1919).

[64]  *See Lassen v. Arizona* ex rel. *Arizona Highway Dept.*, 385 U.S. 458, 470-74 (1967) (reprinting statutory language of the land grants).

[65] *See id.* at 460-61, 466-67; *see also Papasan v. Allain*, 478 U.S. 265, 270 (1986) ("[T]he most recent grants are phrased not as outright gifts to the state for specific use but instead as express trusts.").

[66] *Madison County Bd. of Educ. v. Illinois Central R.R. Co.*, 939 F.2d 292, 305 (5th Cir. 1991).

"An overwhelming body of law"[67] in Mississippi holds that the lands are held in a binding trust.[68] The Mississippi Supreme Court has said the trust dates back to the creation of the state.[69] Although the source of this trust obligation is obscure,[70] the

---

[67] *Morrow v. Vinson*, 666 So. 2d 802, 805 (Miss. 1995); *see also Mississippi Gaming Comm'n v. Bd. of Educ.*, 691 So. 2d 452, 461 (Miss. 1997) (quoting *Morrow*).

[68] *See Morrow*, 666 So. 2d at 805-06; *Hill v. Thompson*, 564 So. 2d 1, 7 (Miss. 1990); *Turney v. Marion County Bd. of Educ.*, 481 So. 2d 770, 776-77 (Miss. 1985); *Bragg v. Carter*, 367 So. 2d 165, 167 (Miss. 1978); *Tally v. Board of Supervisors*, 323 So. 2d 547, 549-50 (Miss. 1975); *Edwards v. Harper*, 321 So. 2d 301, 303 (Miss. 1975); *Holmes v. Jones*, 318 So. 2d 865, 868 (Miss. 1975); *Keys v. Carter*, 318 So. 2d 862, 864 (Miss. 1975); *State* ex rel. *Coleman v. Dear*, 212 Miss. 620, 55 So. 2d 370, 373-74 (1951); *Koonce v. Bd. of Supervisors*, 202 Miss. 473, 32 So. 2d 264, 265-66 (1947); *Pace v. State* ex rel. *Rice*, 4 So. 2d 270, 272, 274, 276 (Miss. 1941); *Washington County v. Riverside Drainage Dist.*, 131 So. 644, 645 (Miss. 1931); *Jefferson Davis County v. James-Sumrall Lumber Co.*, 49 So. 611, 612 (Miss. 1909).

[69] *See Hill*, 564 So. 2d at 7.  One case, *Pace v. State* ex rel. *Rice*, 4 So. 2d 270, 272, 274, 276 (Miss. 1941), has applied the trust obligation to a lease beginning in 1847. The court stated that "the state cannot abdicate its duty as trustee of property in which the whole people are interested, any more than it can surrender its police powers ...." *Id.* at 277.

[70] Some cases suggest that the obligation is a creature of state statute. *See Broadhead v. Bonita Lakes Mall, Ltd. Partnership*, 702 So. 2d 92, 105 (Miss. 1997); *Holmes v. Jones*, 318 So. 2d 865, 868-69 (Miss. 1975).  Other cases appeal to the Mississippi Constitution of 1890, *see Morrow v. Vinson*, 666 So. 2d 802, 805-06 (Miss. 1995); *Koonce v. Bd. of Supervisors*, 202 Miss. 473, 32 So. 2d 264, 265-66 (1947), or the public trust doctrine, *see Secretary of State v. Wiesenberg*, 633 So. 2d 983, 987 (Miss. 1994); *Cinque Bambini Partnership v. State*, 491 So. 2d 508, 511 (Miss. 1986).

Mississippi Supreme Court has declared its existence as a matter of state law,[71] and that is the end of the matter.[72]

The State holds title to the land for the benefit of its schools; the common law rules applicable to private trusts apply to the trust in which Mississippi holds its school lands.[73] and any action taken by the State in violation of this trust is voidable.[74]

---

[71] In addition to the state-law sources of the trust cited above, a few cases suggest that the trust is a federally enforceable creation of Congress, *See Hill,* 564 So. 2d at 6; *Turney v. Marion County Bd. of Educ.*, 481 So. 2d 770, 776 (Miss. 1985). Since the Mississippi Supreme Court has adhered to *Hill* in the face of federal precedent reaffirming that the federal trust is honorary, however, it is clear that the binding trust is grounded in state law. *See Morrow*, 666 So. 2d at 805.

[72] "[W]e interpret the state statute the way we believe the state Supreme Court would." *Vielma v. Eureka Co.*, 218 F.3d 458, 462 (5th Cir. 2000). Of course, the significance of this trust to the Contract Clause is a question of federal law. We note that an earlier Fifth Circuit case, *Madison County Bd. of Ed. v. Illinois Central Railroad Co.*, 939 F.2d 292, 305-06 (5th Cir. 1991), had held that Mississippi state law created no binding trust obligation for sixteenth section lands. This holding was superseded by the Mississippi Supreme Court's decision in *Morrow*, 666 So. 2d at 805. In any case, the narrow holding of *Madison County*, that no trust obligation prevented the sale of sixteenth section land in 1882, remains good law; the Mississippi Supreme Court has held that the trust, as modified by the state constitution, did not prevent the sale of sixteenth section land between 1869 and 1890. *See Lambert v. State*, 211 Miss. 129, 51 So. 2d 201, 203 (1951). We in no way question the validity of sales of sixteenth section land made prior to 1890.

[73] *See Hill v. Thompson*, 564 So. 2d 1, 6 (Miss. 1990).

[74] *See Secretary of State v. Wiesenberg*, 633 So. 2d 983, 987 (Miss. 1994) ("Since [1817], the common law of this State has adhered to the doctrine of public trust, applying it in both sixteenth section lands as well as tidelands."); *Cinque Bambini Partnership v. State*, 491 So. 2d 508, 511 (Miss. 1986) (describing the State's tidelands and navigable waters and the sixteenth

The Mississippi Supreme Court has stated that the State's trust obligations are the equivalent of its police powers, and cannot be contracted away.[75] The exact requirements of the trust have been narrowed at times by statute and state constitution,[76] but the binding nature of the obligation has existed since 1817.[77]

When the leases were signed more than one hundred years ago, the parties did not have the benefit of the body of law on school lands trusts that we have today. The relevant inquiry here is into

---

section lands as "two great public trusts"); *Pace*, 4 So. 2d at 276-77. That grants of land held in public trust are revocable is discussed in *Illinois Central R. Co. v. Illinois*, 146 U.S. 387, 453-54 (1892). *See also* 63C Am. Jur. 2d Public Lands § 7 (1997). Courts also note that common law rules applying to trusts also apply to the maintenance of the sixteenth section lands trust. *Hill v. Thompson*, 564 So. 2d 1, 6, 9 (Miss. 1990); *Bragg*, 367 So. 2d at 167. Even contracts made in good faith are voidable if violating the trust. *See State* ex rel. *Kyle v. Dear*, 46 So. 2d 100, 105 (Miss. 1950); *Koonce v. Bd. of Supervisors*, 32 So. 2d 264, 265-66 (Miss. 1947).

[75] *State* ex rel. *Coleman v. Dear*, 55 So. 2d 370, 373-74 (Miss. 1951); *Pace v. State* ex rel. *Rice*, 4 So. 2d 270, 276 (Miss. 1941).

[76] Elements of this trust are embodied in the Mississippi Constitution of 1890. *See* Miss. Const. of 1890, art. 4, § 95 (forbidding the donation of public lands to private parties); Miss. Const. of 1890, art. 8, § 211 (governing the legislature's regulation of sixteenth section lands). The Mississippi Supreme Court has noted that the Mississippi legislature has discretion in executing its obligations under the trust, at least between 1869 and 1890. *See Lambert*, 51 So. 2d at 203. *Lambert* involved a lease made under the Mississippi Constitution of 1869, which, unlike the Constitution of 1890, placed no express limitation upon the alienation of sixteenth section lands.

[77] *See Hill*, 564 So. 2d at 7. The Mississippi Supreme Court in *Hill* emphasized that section 95 of the 1890 Constitution did not create the state law trust obligation, but merely made it "more concrete." *Id.*

the trust obligations that were the backdrop to the execution of the leases.  We must repair then to the understanding of the trust at that time in order to assess what the parties to the original leases reasonably expected the State's duties and powers with respect to the land were.  While the parties would undoubtedly have understood that the leases were being signed subject to some sort of a binding trust obligation, the source of the trust obligations was far less clear then than now.

At the same time the leases were signed, there was warrant for believing that any trust was federal.  It was generally believed in Mississippi that the Mississippi legislature did not have the authority to sell sixteenth section land until Congress passed a law authorizing its sale in Mississippi in 1852.[78]  Indeed, Congress regularly passed laws altering states' control over sixteenth section land prior to 1852.[79]  For virtually all of the nineteenth century, the Mississippi Supreme Court labored under the belief

---

[78] *See* Act of May 19, 1852, 10 Stat. 6.  In 1829, the Mississippi legislature petitioned the U.S. Congress for authority to sell sixteenth section land.  *See* Memorial of Feb. 5, 1829, 1829 Miss. Laws Ch. CI.

[79] *See* Act of Feb. 1, 1826, 4 Stat. 138 (authorizing the legislature of the state of Ohio to sell the lands heretofore appropriated for the use of schools in that state); Act of March 2, 1827, 4 Stat. 237 (Alabama); Act of May 24, 1828, 4 Stat. 298 (Indiana); Act of Feb. 15, 1843, 5 Stat. 600 (Illinois, Arkansas, Louisiana, and Tennessee).

that the United States did not transfer title to the lands to Mississippi until 1852.[80]

That is, the concept of a state law trust obligation was then perceived to be weaker. The Mississippi Constitution of 1817 contained a provision that appeared to create a trust obligation, and the Mississippi legislature regularly passed statutes regulating the leasing of sixteenth section land.[81] The Mississippi Constitution of 1832, however, did not contain such a provision,

---

[80] *Hester v. Crisler*, 36 Miss. 681, 1859 WL 3619, *2 (Miss. Err. & App. 1859), held that the United States held title to Mississippi's sixteenth section lands until the passage of a federal statute in 1852. Before then, the court held, the State had no authority over the lands. In 1895, the Mississippi Supreme Court recognized that its decision was contrary to the weight of authority and reversed *Hester*. *See Jones v. Madison County*, 18 So. 87, 92 (Miss. 1895). *See Cooper v. Roberts*, 59 U.S. 173, 181-82 (1855) (holding that the grant of sixteenth section land to Michigan, which was virtually identical to the Mississippi grant, created only an honorary trust). *See also Street v. City of Columbus*, 23 So. 773 (Miss. 1898) (expressing the view that Mississippi took title to lands when it was admitted into the union). An 1841 Mississippi case did not reach the question of the nature of the trust but suggested that Mississippi did have authority over the lands. *See Connell v. Woodard*, 6 Miss. 665, 1841 WL 1865, *5 (Miss. Err. & App. 1841).

[81] *See* Miss. Const. of 1817, art. VI, § 20 ("That the general assembly shall take measures to preserve from unnecessary waste or damage such lands as are or may hereafter be granted by the United States for the use of schools . . . and apply the funds which may be raised from such lands, by rent or lease, in strict conformity to the object of such grant; but no lands granted for the use of such township schools shall ever be sold by any authority in this State."). Congress had authorized the leasing, but not sale, of Mississippi sixteenth section land in 1815. *See* An Act to provide for leasing certain lands reserved for the support of schools in the Mississippi territory, 3 Stat. 163 (1815).

stating only that "[a]ll laws now in force in this State, not repugnant to this Constitution, shall continue to operate."[82]

Lipscomb appeals to our prior opinion in this case, which stated that "the trust under which Mississippi operated at best created an honorary, not a mandatory, obligation on the part of the state to administer the lands for the benefit of schoolchildren."[83] This statement responded to the State's argument that the 1830 statute authorizing the "renewable forever" clauses violated the State's trust obligations. Lipscomb argues that the law of the case doctrine requires that we reject the appellants arguments that the State is bound by its trust obligation to maximize the value of the sixteenth section lands.

As should be clear, Mississippi's sixteenth section lands are held in two trusts: one state, one federal. Our prior opinion did not address the existence of a state-law trust obligation and relied only on federal law in reaching its conclusion.[84] As the prior opinion did not expressly or by necessary implication rule on the nature of the state-law trust, there is no law of the case on the state-law trust.

---

[82] *See* Miss. Const. of 1832, Schedule, § 4.

[83] *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 145 F.3d 238, 246 (5th Cir. 1998).

[84] *See id.* (citing *Madison County Bd. of Ed. v. Illinois Central Railroad Co.*, 939 F.2d 292, 305-06 (5th Cir. 1991), and *Alabama v. Schmidt*, 232 U.S. 168, 173-74 (1914)).

With increasing state regulation, the reasonableness of the regulated private parties' expectations of being freed from future regulations by contract with the state is diminished. The Mississippi statutes of the nineteenth century, however, acted to facilitate the transfer of state land to private parties, not to limit the activities of private parties. The statute authorizing the renewable forever leases in Columbus reflects the State's interest in encouraging the development of land in that township – as we will explain, not in derogation of trust obligations but in their discharge.

5

In discharging its obligations to administer the lands for the benefit of education, Mississippi faced certain realities. Unsettled land generates no revenue for the State; yields no agricultural bounty; supports no population; generates no commerce. Both sales and long-term leases at low rates encourage settlement and private investment in new lands.

But a lease that is renewable forever is here superior to a land sale. By retaining title to the land, the State protects itself against default. A lease ensures a perpetual stream of income, however small, that guarantees that misfortune or mismanagement of sales proceeds cannot completely dissipate the income from the lease. Selling land for a lump-sum risks such a loss. Such a judgment is born out in Mississippi's history. It is

the sad story of the Chickasaw lieu lands.[85]  In 1836, Congress conveyed some 174,555 acres of land from the Chickasaw Cession to Mississippi in lieu of sixteenth section land.  In 1856, Mississippi sold this land and invested the proceeds in 8 percent loans to Mississippi's railroads.  Within ten years, this entire investment was rendered worthless when Mississippi's railroads were destroyed during the Civil War.

Thus, to this day Mississippi continues to receive its bargained-for benefit from these leases, just as the leaseholders reap the benefit of extremely favorable rental rates.  The leases have generated a constant stream of revenue that is secured by the State's continuing ownership in the land.  For its first 50 years or so the rental income sustained the schools.  The guarantee of perpetual low lease rates attracted settlement in Columbus, and the leaseholders improved the land they held, increasing the general wealth of the community and enlarging the tax base for later property taxes to support schools.  Upsetting this balance by invalidating the renewal lease rates would substantially impair the contracts.

The State identifies a significant, legitimate, public interest in the leased sixteenth section lands.  The Mississippi courts have stated that preservation of the trust lands for the benefit of the schools is a central governmental power and duty,

---

[85] *See Papasan v. Allain*, 478 U.S. 265, 271-72 (1986).

comparable to the police powers.[86] As we have explained, Mississippi case law has repeatedly emphasized the significance of the State's interest in preserving the value of the sixteenth section lands.

Of course, this interest in protecting the school lands trust is a valid reason for the State's action. Funding schools and avoiding the dissipation of state assets are classic police functions, and section 95 of the Mississippi Constitution is a law of "broad and general" application that does not single out any subset of leaseholders.[87] All this is a given – but it does not respond to the reality that the original structure of the leases has not frustrated the state's obligation. To the contrary, it has rather done the opposite.

We now turn to the final step of the analysis. The State is a party to the contracts, so we cannot defer in the manner of due process to the State's judgment of the reasonableness of its threatened action.[88] Instead, we first ask whether the contracts

---

[86] *State* ex rel. *Coleman v. Dear*, 55 So. 2d 370, 373-74 (Miss. 1951) ("[T]he exercise of the police power of the State is inherent in the existence of a government and is not the subject of a waiver, barter, forfeiture or sale. The State cannot abdicate its duty as trustee of property in which the whole people are interested, such as sixteenth section land held by the State as trustee for schools, any more than the State can surrender its police power in the administration of government and in the preservation of peace and order.").

[87] *Energy Reserves Group*, 459 U.S. at 412.

[88] *United States Trust Co.*, 431 U.S. at 25-26.

32

surrender "an essential attribute of [the State's] sovereignty."[89] If not, we judge the reasonableness and necessity of the impairment.

The leases do not surrender any essential attribute of the State's sovereignty. The leases do not limit the ability of the State to exercise its jurisdiction or police powers over the land. Mississippi courts have stated that the State's duty to the school lands trust is like a police power that cannot be contracted away.[90] But the State has not contracted away its stewardship over the school lands. As we explained, the leases themselves represent the State's fulfillment of its obligation to ensure the funding of schools.

It is instructive that the Mississippi Supreme Court has noted that renewable forever leases are, for tax purposes, practically identical to lands sold by the State.[91] Thus, although the State received the benefit of retaining title to the leased lands, taxes can be levied against the leaseholders. The State has had the benefit of being able to tax the leased land—at the market value

---

[89] *Id.* at 23.

[90] Of course, whether state powers are legitimate justifications for impairment of contracts is a question of federal, not state, law. We need not decide the extent to which the State's trust obligations are like a police power, however, for its obligations under the trust are not diminished by the renewal rental rates of the Columbus school lands.

[91] *See Street v. City of Columbus*, 23 So. 773, 774 (Miss. 1898).

33

swelled by the incentive to develop created by the renewal and price terms—as if it had been sold, while retaining the protection of the collateral that leasing provides. The leases brought rental income and encouraged development that allowed the imposition of property taxes for the benefit of schools.

The leases exercise the State's power to serve the trust, they do not limit that power. The State seeks to escape a purely financial obligation—its agreement to accept fixed rent terms for the Columbus school lands while reaping the benefits of the land's development – an arrangement that proved to be a hedge against inflationary erosions of rental income, inevitably attended by increasing land "values."

In sum, invalidating the renewal rental rates of the leases is not reasonable and necessary to protect the State's interest in its school lands. Mississippi might have followed the familiar path of granting fee title to land in exchange for its development—a common practice in the American West and the Mississippi Territory. It is fair to ask whether in such circumstances the state could now exercise its police power to alter an incident of fee ownership to charge market rents in addition to school taxes without compensating the landowner. In actual fact, the state constructed a hedge.

The State insists, nonetheless, that the Supreme Court's decision in *City of El Paso v. Simmons*[92] requires that we reverse and find no violation of the Contract Clause.  We disagree. *Simmons* involved a land purchase contract entered into in 1910.  At that time, the Texas State Land Board was authorized to sell state lands for the benefit of the State's Permanent Free School Fund. The sales had generous terms and in practical effect the buyers of the land had only to put down one-fortieth of the purchase price and pay interest on the remaining principal in order to keep the property.  But upon failure to pay interest, the statutes authorized forfeiture of the property back to the State.[93]  A buyer retained a perpetual right of reinstatement, however, if he paid all of the back-interest due.[94]  In 1941, the legislature changed the reinstatement law to allow reinstatement only within five years of forfeiture.[95]  A buyer who failed to gain reinstatement within five years brought suit, alleging that the 1941 legislation violated the Contract Clause.[96]

The Supreme Court held that the 1941 legislation did not violate the Contract Clause.  The Court emphasized that the measure

---

[92] 379 U.S. 497 (1965).

[93] *See id.* at 498.

[94] *See id.* at 498–99.

[95] *See id.* at 499.

[96] *See id.* at 500.

was enacted to remedy a substantial abuse of the prior law: Speculators would enter into contracts to purchase land and then immediately default. If oil was discovered on their land, they would exercise their right to reinstatement; otherwise, they would remain in default.[97] In essence, the buyers purchased an option of infinite duration, obtaining all of the benefits of any substantial appreciation in the value of the property, while leaving Texas with the risk that the land would decline in value. This situation undermined the purpose of the land sale contracts–the funding of schools.[98] Further, it did not serve the purpose of the reinstatement clause, which was to protect bona fide purchases who fell behind on payments, not to subsidize speculators.[99]

The Supreme Court noted that the right to reinstatement "was not the central undertaking of the seller nor the primary consideration for the buyer's undertaking."[100] The Court reasoned that the right to reinstatement could not have reasonably been intended to create "an endless privilege" since such a construction "would render the buyer's obligations under the contract quite illusory."[101] The fact that Texas was seeking to sell as much land

---

[97] *See id.* at 509–13.

[98] *See id.* at 515.

[99] *See id.*

[100] *Id.* at 514.

[101] *Id.*

36

as possible at the time of the sales did not undermine the validity of its change of policy.[102]  Most importantly, the Court stated, "[l]aws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of the contract."[103]  It then went on to note "the State's vital interest in administering its school lands to produce maximum revenue," and it concluded that given this interest and the prior abuses of the law, "a statute of repose was clearly necessary."[104]

This case differs substantially from *Simmons*.  The reinstatement clause in *Simmons* operated to frustrate the purpose of the land sale contract by allowing speculators to buy an option on the land.  An indefinite reinstatement provision, as the Court noted, rendered the buyer's obligations "illusory."  Under this construction Texas would depend on the buyer's discretion in making payments.  Thus, the purpose of the plan was frustrated from the outset.

As we have explained, by contrast, in this case the leasing arrangements guaranteed Mississippi a steady stream of income, which in fact supported the public school in Columbus for many

---

[102] *Id.*

[103] *Id.* at 515.

[104] *Id.* at 516.

37

years.  The renewable forever provisions created incentives for substantial investment in the development of leased lands and a growing tax base to further sustain the schools.  Moreover, the state was left with remedies should the lessee default.  The state got exactly what it needed, and the purpose of the contract was fulfilled, not frustrated.

V

To summarize:  We have jurisdiction over this case.  The current leases are renewals of the original leases executed before the ratification of the 1890 Constitution.  Thus, section 95 of the 1890 Constitution impairs the renewal terms of the lease contracts.  Because voiding the current lease rates on the school lands substantially impairs the contract rights of the leaseholders, and the State's threatened action is not reasonable and necessary, we affirm the entry of summary judgment against the Secretary declaring that voiding the Columbus school land leases would violate the Contract Clause, a declaration that may be enforced by injunctive relief.

We AFFIRM and REMAND to the district court for further proceedings including any necessary resolution of disputes over the entitlement of individual class members to the relief declared by the district court and today affirmed by this court.  We do not suggest that there will be such disputes.  Rather we here make

38

clear that our mandate does not foreclose their resolution by the

district court.

AFFIRMED and REMANDED.